PIZZUTO, J.T.C.
Texas Eastern Transmission Corporation (Texas Eastern) has contested the real property tax assessments on segments of pipeline used for interstate transmission of natural gas in several taxing districts. The tax appeals have been tried together, and all essentially involve the same disputed questions of valuation practice. Resolution of these questions must proceed, the parties acknowledge, in light of the decision in Transcontinental Gas Pipeline Corp. v. Bernards Tp., 111 N.J. 507, 545 A.2d 746 (1988) (Transcontinental II). Justice Handler’s opinion in that case examined the various approaches to pipeline valuation and concluded that the appropriate measure of pipeline value for real property taxation is replacement cost less depreciation.
After an exhaustive review of the market and income valuation approaches, Transcontinental II concludes that these approaches fail to yield fair taxable value. The market approach cannot be employed because of the lack of truly comparable sales, while the income approach is precluded by numerous complexities in the heavily regulated rate-making process administered by the Federal Energy Regulatory Commission (FERC). In computing local property tax assessments, the objective is to determine the value the pipeline segments have, not to investors in the transmission company, but to its customers, who would bear the cost of replacement in the event the property were lost or destroyed. Transcontinental II, supra, 111 N.J. at 531-32, 545 A.2d 746. It *29 is therefore necessary to employ the cost approach and to compute the hypothetical cost of constructing equivalent lengths of pipeline that would be adequate for transmission of the quantity of natural gas that can be economically marketed under current conditions. The resulting replacement cost for new pipeline must then be adjusted by a depreciation factor that recognizes the age and condition of the actual pipeline and its remaining useful life in both physical and economic terms.
Value estimation through the cost approach is an accepted and commonly used technique of property appraisal that requires the appraiser to follow a series of defined steps. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 345-55. The first step is the determination of a value for land. The appraiser then computes the replacement cost of improvements, including all direct and indirect elements of cost expected to be incurred. Next, the appraiser examines the question of entrepreneurial profit and determines whether any adjustment to the total improvement cost previously derived is required to account for a market value differential. Then, depreciation accrued on the improvements by virtue of physical, functional and economic (or external) factors is deducted. Finally, the land and improvement values are added together.
Both Texas Eastern’s appraisal expert and the single expert for all the taxing districts acknowledge the propriety of this method, and each maintains that he has followed it correctly in his valuation of the subject pipeline segments. At each step of the process, however, the appraisers are in conflict over either the inclusion of an element of value or the method of its calculation from available data. The taxing districts’ expert includes in replacement cost an element for the right-of-way through which the pipeline runs, while Texas Eastern’s expert has determined replacement cost only for the physical improvements.
*30 Both appraisers look primarily to the Marshall Valuation Service for the unit costs to be employed in calculating replacement cost of pipeline; but the taxing districts’ appraiser has chosen the costs reported by Marshall for utility piping and has made adjustment for indirect costs, while Texas Eastern’s appraiser has used Marshall’s costs for long-run transmission lines without an indirect cost adjustment. The appraiser for the taxing districts adds an increment for entrepreneurial profit, while Texas Eastern’s appraiser does not. The appraisers differ, finally, in the depreciation rates that they employ. In order to develop a consistent appraisal method to be followed for all the pipeline segments on appeal, these issues will be addressed in order.

Right-Of-Way.

The expert for the taxing districts has derived current unit values for each of the tax years at issue for the right-of-way through which the subject pipeline segments run. He utilized the reported costs of right-of-way acquisition published in the Oil & Gas Journal in establishing his values.[1] He also examined right-of-way agreements between utility companies and fee owners, which he regarded as comparable to those Texas Eastern has executed with the owners of the property through which its pipeline runs. For each tax year, he has derived a unit value for a linear foot of right-of-way, which he has employed uniformly to the entire length of all of the pipeline segments.
The expert did not, however, treat these values as land values would conventionally be handled in a cost approach valuation. The standard practice would require addition of the full current land value to the depreciated cost of improvements to establish total value. Instead, the taxing districts’ expert included the current market value that he established for right-of-way as an *31 element of the replacement cost of improvements, and he made adjustments for indirect cost, entrepreneurial profit and depreciation to a total replacement cost that included the current cost of right-of-way acquisition.
Texas Eastern’s objection to the inclusion of right-of-way acquisition costs in computing the taxable value of pipeline is based on legal argument, rather than expert opinion. It characterizes its rights-of-way as easements-in-gross, not subject to real property taxation. The argument is that the value of the real property through which its rights-of-way run must be determined and assessed against that property without diminution by virtue of Texas Eastern’s interests. To include the value of right-of-way in the pipeline assessment, the taxpayer argues, is to tax the same interest twice.
The principle that the fee owner is assessable for the totality of the interests in a parcel of real property is frequently expressed. Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App. Div.1972); In re Appeal of Neptune Tp., 86 N.J.Super. 492, 207 A.2d 330 (App.Div.1965); Stack v. Hoboken, 45 N.J.Super. 294, 132 A.2d 314 (App.Div.1957); Lidell v. Mimosa Lakes Ass’n., 6 N.J.Tax 417 (Tax 1984). In applying this principle, it is recognized that appurtenant easements add taxable value to the dominant tenement and concomitantly reduce the taxable value of the servient tenement. Englewood Cliffs Bor. v. Estate of Allison, 69 N.J.Super. 514, 526-28, 174 A.2d 631 (App.Div.1961). It does not, however, logically follow that an easement-in-gross will never reduce the taxable value of the burdened property. Englewood Cliffs in fact required a value reduction for property burdened by an easement-in-gross in favor of the general public.[2] Nor does it follow that an easement-in-gross may never be a taxable interest, *32 either in its own right or together with taxable improvements constructed by virtue of the rights conferred by the easement.
Real property taxation of utility easements was addressed in Tewksbury Tp. v. Jersey Central Power & Light Co., 159 N.J.Super. 44, 386 A.2d 1348 (App.Div.1978). It was determined that a public utility easement is not taxable real estate within the narrow definition of that term expressed in N.J.S.A 54:30A-50(b), which is applicable to utilities subject to taxation measured by gross receipts. See also Public Service Elec. & Gas Co. v. Woodbridge Tp., 73 N.J. 474, 375 A.2d 1165 (1977). Texas Eastern, however, is not subject to the public utility gross receipts tax statutes; if it were, its “lines” and “pipes” would be exempt from taxation under the same definition of real estate interpreted in Tewksbury.
It is actually the dissent in Tewksbury that is apposite here, since Judge Lamer did not consider that N.J.S.A 54:30A-50(b) required a different definition of the term “lands” for utilities subject to gross receipts taxation from that which is applicable to other taxpayers. The dissent’s analysis of decisions that antedate the public utilities gross receipts and franchise tax statutes affords a basis to conclude that utility easements should be taxed as real estate when, as here, N.J.S.A. 54:30A-50(b) does not apply.
In this case, the taxing districts do not seek to assess the entire value of the pipeline easement as land. Their appraiser has, rather, included right-of-way acquisition cost in the depreciable replacement cost of improvements. The principle of taxation of the totality of interests does not, for the reasons given above, preclude this treatment. It is, moreover, consistent with the objective defined in Transcontinental II of determining taxable value from the perspective of the ratepayers, who would bear the cost of replacing the property. The pipeline company’s right-of-way is an asset of unquestionable value to Texas Eastern’s customers. While it is not likely that an easement over land would be lost or destroyed so as to require actual replacement through charges to ratepayers, the durability of the easement is not the *33 issue. In fact, it emphasizes the economic reality that the ratepayers derive benefit from Texas Eastern’s rights-of-way.
Although this characterization was not expressly made at trial or in argument, the taxing districts’ appraiser has, in effect, treated the easements as depreciable assets whose economic value exists only in connection with pipeline operation.[3] In the absence of a contention that the easements should be taxed as land, without depreciation, I conclude that defendants’ appraiser has appropriately treated right-of-way acquisition cost. Should an independent value for the easements come to be asserted in the future, it may be necessary for this court to determine whether depreciation should then be taken. On the present record, however, there is merely speculation that both physical improvements and rights-of-way may have value to other users (e.g., fiber optic communication companies). There is no basis to conclude that, separate from the improvements for sake of which they were acquired, the rights-of-way would be marketable at any price, either back to the fee owners or to other parties.
Texas Eastern has offered no data to indicate the acquisition cost of pipeline rights-of-way on the assessment dates for the tax years at issue, but has relied principally on its argument that this element is excluded from the computation of taxable value as a matter of law. Having rejected that argument, I accept the cost calculations of the taxing districts’ expert as adequately supported by analysis of published data and comparable sales. I decline to accept Texas Eastern’s argument that cost should not be established at the same rate for the full length of all of the pipeline *34 segments. The taxpayer’s contention is that cost of acquisition differs with location and depends upon whether the right-of-way is acquired directly from the fee owner or by license from another regulated entity in that entity’s own right-of-way. Although these are arguable propositions, in the absence of any cost analysis from taxpayer’s expert that demonstrates the difference in cost, I conclude it is reasonable to accept a uniform unit cost for right-of-way.
Texas Eastern presents an additional argument that the taxing districts are precluded from asserting a taxable value for rights-of-way because they “did not appeal the absence of land values.” This argument is unsound for several reasons. First, it is evident that the taxing districts have regarded right-of-way acquisition cost as a component of the improvement assessment at depreciated replacement cost. Second, even if land values were directly at issue, it has long been recognized that the division of an assessment between land and improvements is an administrative action that does not create two separately contestable assessments. In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 33-34, 166 A.2d 763 (1961). Third, Chevron U.S.A, Inc. v. Perth Amboy, 9 N.J.Tax 571 (Tax 1988) establishes that a taxing district may defend a contested assessment by a valuation that includes components omitted in the original assessment.
Certain minor adjustments to the calculations of the taxing districts’ expert are, however, required to make them logical and consistent. Where Texas Eastern is the fee owner of the land through which the pipeline runs, it has not incurred a separate acquisition cost for right-of-way, and it is not necessary to include that cost in the pipeline valuation. Similarly, it is inappropriate to include the full right-of-way acquisition cost for each of several pipelines running through the same right-of-way. A single acquisition cost should be allocated equally among the number of separate pipeline segments located in the same right-of-way. 0With these adjustments, the taxing districts’ right-of-way calculations are accepted.

*35
Pipeline Replacement Cost.

In computing the replacement cost of the physical pipeline, the appraisers are fundamentally inconsistent in their use of the standard cost estimation manual. Both appraisers resort to the Marshall Valuation Service to estimate replacement cost. The taxing districts’ appraiser, however, generally looks to the table in the Marshall manual that deals with “utility piping,” while the taxpayer’s appraiser uses the table applying to “pipeline costs.”[4]
Both tables appear in the same section of the unit-in-place portion of the Marshall manual and were reproduced in the appraisal reports that were placed in evidence. The general information note provided in the publication for this section indicates that the utility piping cost factors used by the taxing districts’ expert apply to “pipes, fittings and valves installed outside of and up to building lines.” The caption to the utility piping table further states that the table displays “[e]ost per linear foot for underground utility lines, including fittings, an allowance for trenching and backfill and contractor’s overhead and profit.” The pipeline costs table used by taxpayer’s expert, on the other hand, describes the property it covers as follows:
Moderate pressure, long-run, cross-country, welded steel, underground oil and gas transmission lines, not including compressors, pumping stations, bridges, etc. Costs are smoothed averages of contract costs. The normal range is from 75% to 150% of the listed costs, depending on length and type of pipe and pipe protection, terrain and geology, climate, location, etc. Right-of-way costs are not included.
For certain pipe diameters the unit cost ranges of the tables overlap and produce similar values. For example, for 12-inch steel pipe the utility piping table published in 1984 gives a range of $34.05 to $42. a foot, while the pipeline costs table of the same date gives 75% to 150% of $54. In some instances the taxpayer’s figures, after adjustment by time and place multipliers, are actual *36 ly higher than the taxing districts’ figures, after similar adjustment,[5] but before adjustment for indirect costs.
The dispute over how to utilize the Marshall Valuation Service, at least as far as the appraisal reports originally disclosed, was only partly over the choice of the appropriate table as a starting point for valuation of transmission lines. In perhaps greater measure, it was over whether either table reflected a comprehensive cost figure that included indirect costs, such as professional fees, regulatory expenses and supervisory costs, as well as direct construction costs. Both appraisers acknowledge the need to account for indirect costs; they differ over whether the Marshall tables have already done so. Taxpayer’s expert considers the table he employs to include all direct and indirect costs, but the taxing districts’ expert finds it necessary to increase his table’s figures by 20% to account for indirect costs.
The descriptive language of the manual would appear to convey adequate emanation that interstate natural gas transmission pipeline is appropriately valued by factors selected from the pipeline costs table employed by taxpayer’s expert. It would also appear that the pipeline costs table does not include indirect costs because they are not “contract costs” whose averages the table displays. Both appraisers, however, made inquiry of Marshall representatives and proceeded in the inconsistent fashion indicated on the basis of advice received.
Texas Eastern presented, in rebuttal, the testimony of the chief editor-manager of the Marshall appraisal group, who had personally advised taxpayer’s expert that the pipeline costs table should be the starting point and that it included indirect costs. During cross-examination, however, the editor could not reconstruct the process by which the comprehensive cost information for numerous individual pipeline construction projects published in the Oil & *37 Gas Journal was converted into the smoothed averages of the published table. Neither could he explain precisely how indirect costs were treated.
The record contains the computer spreadsheets used to analyze data reported in the November 1988 Oil & Gas Journal in the course of preparation of the pipeline costs table published by Marshall in March 1989. The reported projects are grouped by diameter of pipe, and the spreadsheets show that averages were computed of labor costs and material costs for all projects in each group and that averages of indirect costs were not computed. Selective comparison of the spreadsheet averages with the published table failed to demonstrate any discernible pattern of correspondence. It bears noting, however, that all the testimony concerning preparation of the pipeline costs table relates to the March 1989 version of the table, published later than the assessment date for any tax year at issue, and not to the earlier versions actually used by taxpayer’s expert. The Marshall analysis of the November 1988 Oil & Gas Journal data seems to have been undertaken not to derive a new table, exclusively reflecting current costs, but rather to test the need for a percentage adjustment to the previous table’s presentation of earlier costs.
In post-trial submissions, the taxing districts have taken the position that the absence of an explanation of the Marshall averaging process deprives the pipeline costs table of reliability and that Texas Eastern’s appeals should be dismissed for failure of the plaintiff to adduce evidence of the requisite certainty to overcome the presumption of correctness attaching to the assessments. See Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 89 A.2d 385 (1952). The taxing districts argue that taxpayer’s expert has, by his own admission, mechanically employed data from the pipeline costs table that bears no demonstrable relationship to the base from which it purports to derive. In advancing this argument, the taxing districts also implicitly disavow their own appraiser’s cost calculations and embrace assessments that are entirely without explanation.
*38 Although the conclusion is inevitable that both appraisers have accepted published valuation factors without extensive independent analysis in fixing base pipeline replacement cost, dismissal of these appeals is, in my opinion, inappropriate. In the first place, the presumption of correctness issue arises from testimony offered to support an appraiser’s choice of one table over the other and his treatment of indirect costs. The Marshall averaging methods were never directly at issue. The testimony, in addition, related not to the table actually used, but to a later revision. Moreover, these appeals present, as the taxing districts recognize, the first occasion to apply the directives of Transcontinental II in an area of long-standing uncertainty in assessment practice.
The most important consideration in favor of proceeding to value, however, is the availability of the underlying data contained in the Oil & Gas Journal reports to evaluate both the accuracy of the Marshall cost factors and the need for an adjustment to account for indirect costs. The reports contain comprehensive lists of current pipeline construction projects in the United States and list material, labor, right-of-way and miscellaneous costs separately for each project. Miscellaneous costs generally include engineering, supervision, surveying, interest, administration and overhead, contingencies and FERC fees. The reports also provide the average cost for a mile of pipeline for each of these elements for each of the last ten years for pipelines of various sizes. The information is compiled from FERC filings and was available to both appraisers when they began their assignments. The expert for the taxing districts used the data in deriving right-of-way costs and an incremental cost factor of 20% for indirect costs. The reports for 1983 through 1988 are in the record as part of the taxing districts’ evidence. Cost information for hundreds of pipeline projects, including 26 entirely within New Jersey, is collected.
Given the availability of this information to test the manual’s average costs, I conclude that the Marshall pipeline costs table can appropriately, if provisionally, be used as the starting *39 point for valuation. In the course of this case neither party has attempted to derive base cost figures directly from the Oil & Gas Journal data, and I will not attempt to do so. It is sufficient to say that taxpayers and taxing districts are capable of employing their own methods to derive alternative numbers to the Marshall table. Without the benefit of reasoned analysis, subject to adversarial testing, I believe it would be inappropriate to undertake that exercise at this time. I simply hold that, on the record of this case, given the availability of the Oil & Gas Journal data, the taxpayer has satisfied the burden of overcoming the presumption of correctness.
I conclude that the pipeline costs table should be provisionally accepted as containing what the Marshall publication states it contains (viz., average construction contract costs). I conclude that it does not extend to indirect costs because the publication does not list them in the description of costs represented, which is confined to contract costs.[6] I also accept the conclusion of the taxing districts’ expert that 20% of base cost is an appropriate adjustment for indirect costs as adequately grounded in his analysis of the Oil & Gas Journal data.
Pipeline replacement cost is therefore to be determined by taking the base cost figures selected by taxpayer’s expert from the Marshall pipeline costs table and first adjusting them for time and location as that expert has. Then the multiplier of 1.20 derived by the taxing districts’ expert for indirect costs is to be applied. *40 Right-of-way acquisition is also to be treated according to the method of the taxing districts’ appraiser, with the adjustments noted above, in fixing total depreciable cost.

Entrepreneurial Profit.

The appraisers also differ over the necessity of an addition to replacement cost to account for entrepreneurial profit. Taxpayer’s appraiser finds the concept inapplicable to this property, while the appraiser for the taxing districts adds an entrepreneurial profit factor of 10% of all replacement costs previously discussed. I conclude that the approach of taxpayer’s appraiser is the correct one.
The theoretical basis for an entrepreneurial profit adjustment has been authoritatively described in the generally accepted compendium of appraisal practice as follows:
An anticipated profit is often the primary motivation for developing property. The total cost of a project before entrepreneurial profit should be less than the market value of the completed property to reward investors for their risk. The difference between the cost of development and the value of a property after completion is the entrepreneurial profit or loss. This is also known as developer’s profit. Whether a profit is actually realized depends on how successful the developers have been in selecting the site, constructing the improvements, obtaining the proper tenant mix, and designing the leases, and how well they have analyzed the market demand for the property.
[The Appraisal of Real Estate, supra at 353.]
The same treatise further observes:
If the cost approach is to provide a reliable indication of value, the appraiser must add to the direct and indirect costs a figure that represents the entrepreneurial or developer’s profit that is reflected in the market. Some appraisers feel that entrepreneurial profit has no place in the cost approach. They contend that the existence or absence of developer’s profit or loss is relevant only in the income capitalization and sales comparison approaches. Although a developer is motivated by the anticipation of profit, his or her efforts may not always be rewarded. Accordingly, it would be equally plausible to include a potential entrepreneurial loss in the cost estimate. Essentially, entrepreneurial profit is a market-derived figure that reflects the amount that the entrepreneur, or developer, expects to receive in addition to costs.
[Id. at 359; footnote omitted.]
In its summary of the cost approach, The Appraisal of Real Estate notes that the entrepreneurial profit adjustment should be made only “when appropriate.” Id. at 350.
*41 Proper use of the cost approach requires, not a mechanical addition of 10% for entrepreneurial profit, but a critical analysis of the property in its market on the appraisal date to determine whether cost should be adjusted upward or downward to take account of market conditions. The task is to ascertain whether the market will pay more or less than replacement cost for new construction of the kind being valued, to quantify the difference and to adjust accordingly. Although the conventional designation of the adjustment is phrased in terms of profit, it is preferable to conceptualize in terms of adjustment to market without presuming the direction.
The Tax Court has recognized an increment for entrepreneurial profit in valuation of diverse kinds of property. Beneficial Facilities Corp. v. Peapack and Gladstone Bor., 11 N.J. Tax 359, 381 (Tax 1990), aff'd, 13 N.J. Tax 112 (App.Div.1992), certif. denied, 130 N.J. 397, 614 A.2d 619 (1992) (corporate headquarters complex); Glen Pointe Assocs. v. Teaneck Tp., 10 N.J.Tax 506, 515-16 (Tax 1989) (office buildings); McGinley Mills v. Phillipsburg, 9 N.J.Tax 508, 517 (Tax 1988) (user-developed industrial facility); Twin Oaks Assoc. v. Morristown, 9 N.J.Tax 386, 397 (Tax 1987) (regulated nursing home); Abe Schrader Corp. v. Secaucus, 8 N.J.Tax 390, 395 (Tax 1986) (warehouse/retail outlet building); Lawrence Assocs. v. Lawrence Tp., 5 N.J.Tax 481, 534-38 (Tax 1983) (shopping center).
In the earliest of these cases, Lawrence Assocs., the appraisers agreed that 10% was an appropriate allowance. The later cases (with the exception of Twin Oaks where 5% was allowed) continue to employ that factor as a useful and convenient measure where market analysis warrants an adjustment.
An adjustment for entrepreneurial profit has not been allowed when the market provided no basis for it or when the property was not of a kind whose development is undertaken to realize a real estate development profit. Badische Corp. v. Kearny, 11 N.J.Tax 385, 402 (Tax 1990) (improvements had suffered substantial economic obsolescence); Litton Business Sys., Inc. v. Morris Plains Bor., 8 N.J.Tax 520, 533 (Tax 1986) (income and *42 market approaches supported no increment in value for entrepreneurial profit); Berkley Arms Apartment Corp. v. Hackensack, 6 N.J.Tax 260, 272-73 (Tax 1983) (advanced age of improvements and limited extent of entrepreneurial effort required to convert rental apartment building to cooperatives rendered factor inappropriate). In Lawrence Assocs., the court found that an entrepreneurial profit factor was appropriately applied to the reproduction cost of the shopping mall’s buildings and site improvements, but not to the cost of a highway overpass constructed for access to the mall “because the overpass per se is not a commercial venture which an entrepreneur would be induced to construct with the expectation of earning a profit separate from that derived from the Mall itself.” 5 N.J.Tax at 538.
The segments of interstate natural gas transmission pipeline at issue are, I conclude, a kind of property for which entrepreneurial profit or loss analysis is inappropriate. There is simply no indication of any market against which to compare replacement cost. Pipeline is not constructed by developers in the expectation of profit on its sale. It is exclusively constructed by regulated operating companies for use in their business at costs which are passed through to the ratepayers. The absence of actual market transactions impelled Justice Handler to reject the pipeline sales offered to establish value under the market approach in Transcontinental II. The expert for the taxing districts has produced no market data in this case, and his reliance on the taxpayer’s expectation of profit from the operation of the pipeline confuses business profit with development reward.
No entrepreneurial profit or market adjustment is therefore to be employed in valuing the subject property.

Depreciation.

In calculating accrued depreciation for the pipeline segments, the appraisers maintain conflicting opinions concerning the useful life of the property. The expert for the taxing districts, emphasiz *43 ing the continuing physical utility of the property, regards the transmission of gas as a business that will be profitable indefinitely and concludes that a 100-year useful life is appropriate. He therefore computes accrued depreciation for each pipeline segment at 1% of replacement cost for each year of actual age. Taxpayer’s appraiser emphasizes economic factors and applies to actual age the annual depreciation rate (2.9%) that FERC, based on its determination of remaining useful life, currently allows Texas Eastern to use to recover the original cost or book value of its pipeline. Taxpayer’s expert recognizes, however, a residual value for any pipeline segment that is still in use, and he therefore limits total accrued depreciation on any segment to 80%.
Both appraisers acknowledge that the pipeline is continually maintained, but neither has attempted to take maintenance into account in fixing an effective age for the property. Similarly, neither appraiser has made any adjustment for economic or functional obsolescence of particular pipeline segments, either in computing depreciation or in determining the size or capacity of the pipeline that would be constructed in the market conditions existing on the assessment dates. In all instances, both appraisers utilized actual dimensions and treated actual age as effective age. While taxpayer’s expert considered that certain of the segments would be replaced by pipeline of different diameter, he did not use the different dimension in his replacement cost calculations because he found that the existing segments had reached his maximum accrued depreciation.
The parties to this litigation have, in respect of the depreciation issue, done little more than adopt the positions of their predecessors in Transcontinental II. No party has seriously undertaken to present direct support for a useful life contention. The taxing districts essentially rely on Justice Handler’s observation in Transcontinental II that, on the record in that case, “in the absence of evidence to the contrary, the Township’s estimation of a 100-year functional life was not unreasonable.” 111 N.J. at 533, 545 A.2d 746. Texas Eastern has presented general testimony that some pipeline will require replacement for functional reasons *44 before its use for natural gas transmission ceases as a consequence of changes in the economics of the energy business. It submits, however, that the determinative factor for useful life is economic utility, and it rests on the FERC depreciation analysis to establish economic useful life.
On the present record, I accept the FERC depreciation analysis as providing an appropriate measure of remaining useful life. In reaching this conclusion, I do not consider it significant that FERC’S analysis may primarily concern economic factors, such as supply, demand, technology and energy policy, rather than the physical construction or condition of the pipeline. Economic factors are indisputably relevant to the determination of useful life; and, regardless of the weight FERC may accord to economic or physical factors, its determination is an official action of a government agency with special expertise. I therefore conclude that an appraiser may reasonably rely upon FERC’S findings. There is no adequate foundation in this record for the 100-year useful life contention of the taxing districts, and a foundation cannot be supplied from citations to the Transcontinental II opinion.
I conclude, however, that Texas Eastern has misconceived the significance of the FERC depreciation analysis in proposing to apply the FERC depreciation rate against, the chronological age of the pipeline segments. Texas Eastern’s own witness on the subject of FERC regulation explained that the regulatory purpose of the FERC depreciation rate is to allow recovery (through charges to ratepayers) of undepreciated book value over the remaining useful life of the pipeline.[7] The rate therefore reflects FERC’s determination of remaining useful life and has no direct *45 bearing on the measurement of accrued depreciation, which by definition is attributable to that portion of useful life that has already elapsed.
The remaining useful life determined by FERC can enter into a calculation of accrued depreciation, if it is added to the effective age of each pipeline segment to yield a total useful life for that segment. Once that is done, the ratio of effective age to total life can become an appropriate measure of accrued depreciation. In other words, a given pipeline segment has, at a particular assessment date, a total useful life equal to its effective age plus the remaining useful life determined by FERC as of that date. Absent a basis for a different conclusion, its effective age is its actual age, and accrued depreciation is replacement cost multiplied by the fraction of total useful life that has already elapsed. For example, a pipeline segment that is 10 years old on the assessment date and has a remaining useful life of 30 years will have accrued depreciation of 25% (age/age plus remaining useful life) of its current replacement cost.
I do not consider this conclusion to be inconsistent with Justice Handler’s observation that FERC allows pipeline property to be depreciated over a shorter time than its functional life. Transcontinental II, supra, 111 N.J. at 520, 522, 533, 545 A.2d 746. In part, this result may occur because undepreciated costs are amortized over remaining useful life, rather than because remaining useful life is understated. FERC is charged to determine remaining useful life based on all relevant considerations, including exhaustion of natural gas supplies, as of the time a given rate determination is made. Uniform System of Accounts, 18 C.F.R. Part 201 (Definition 12B) (1990). If, in a subsequent rate determination, FERC finds that economic factors have changed, the projected useful life may lengthen and the fraction of book value *46 previously taken as accrued depreciation may come to exceed the elapsed fraction of the newly determined useful life. If depreciation already accrued is disregarded in establishing the prospective rate at which undepreciated book value is amortized, the ratepayers would effectively be charged at rates that yield accelerated recovery to the pipeline company.
This result would not deprive either the current or the former useful life determination of its basis, at the time it was made, in expert evaluation of relevant factors. The depreciation formula developed in this opinion, moreover, shifts the focus from the remaining useful life of the entire pipeline system to the elapsed portion of useftd life of particular pipeline segments. This shift in focus, in itself, substantially neutralizes any tendency of the FERC findings to result in undervaluation. As long as any pipeline segment is still in use, it will not be fully depreciated; depreciation will instead be limited by the elapsed fraction of useful life.
The formula would also take account of the effect of maintenance, if that factor had been quantified by the experts. Where it can be shown that maintenance has reduced effective age, the allowance for accrued depreciation will be less than where actual age is taken, as it has been here, as effective age. In addition, continuing assessment review allows for further correction. If a FERC rate determination recognizes a longer system life, the elapsed fraction of the useful life of any segment necessarily decreases. The result, for local properly taxation, is (other considerations being equal) an increase in taxable value due to changes in external factors. The record indicates that FERC rate review occurs at frequent intervals, approximately every three years. Diligent assessors can ascertain from pipeline companies the necessary information concerning current FERC useful life determinations, and taxing districts may pursue available remedies to revise assessments to reflect current values.
If it is treated in this manner, I conclude that the FERC depreciation analysis, like the Marshall cost factors, can provide *47 an appropriate measure for pipeline assessment, subject to further refinement in light of specific evidence and argument adduced by parties to future litigation.
Accrued depreciation for each pipeline segment should therefore be determined by multiplying total replacement cost calculated in the manner described (including right-of-way acquisition and indirect costs, but without market adjustment for entrepreneurial profit) by a ratio for each segment equal to its chronological age divided by the sum of that chronological age and the remaining useful life implicit in the FERC rate determination effective on the applicable assessment date. Replacement cost less accrued depreciation yields true value. Existing assessments can then be revised, if necessary, to reflect true value in accordance with the rules of N.J.S.A 54:51A-6 (chapter 123).

Conclusion.

This opinion has developed a comprehensive application of the cost approach to valuation of the subject pipeline property that resolves the seriously contested questions of appraisal method. Factual issues were also presented concerning the physical characteristics (age, length or diameter) of certain portions of the property. I accept the testimony of Texas Eastern’s witnesses, based on the company’s construction and maintenance records, to establish these facts.
The calculations necessary to determine taxable value are complex and the number of pipeline segments involved is large. Therefore the parties are directed to prepare agreed calculations pursuant to R. 8:9-3. Computational disputes may be resolved, after submission of proposed figures on notice to all parties, by hearing conducted under R. 8:9-4.

 The Oil & Gas Journal publishes an annual pipeline economics report that collects comprehensive cost data on current pipeline construction projects, and the parties do not dispute the reliability of the data.

 The question of the effect of various property interests and restrictions on taxable value has recently been addressed in Prowitz v. Ridgefield Park Village, 237 N.J.Super. 435, 568 A.2d 114 (App.Div.1989), aff'd, 122 N.J. 199, 584 A.2d 782 (1991).

 The appraiser's treatment of the cost of acquiring right-of-way appears to be consistent with FERC practice. The testimony of a Texas Eastern witness actively engaged in regulatory affairs was that FERC includes this acquisition cost in the historical cost of "plant-in-service.” He used the same term to identify the base on which FERC allows depreciation to be taken. Express reference to the issue has not been discovered in the Uniform System of Accounts prescribed by FERC for natural gas companies (18 C.F.R. Part 201 (1990)).

 For the earliest of the tax years in issue (1984), the experts use the same table because for that year a separate utility piping table was not published.

 The appraisers have in some instances chosen different New Jersey locations for their local multipliers, but these differences do not significantly affect value.

 An examination of a limited number of New Jersey pipeline projects appears to confirm, tibe need to adjust for indirect costs here, if (as taxpayer’s expert employs the table), the stated average figure (and not a percentage variant) is taken as the starting point. The 1986 Oil & Gas Journal report lists two 36-inch pipeline projects in New Jersey; the 1988 report includes two apparently distinct projects. There are no statistical extremes among these projects, and they presumably reflect typical New Jersey costs. Costs for a linear foot for labor and materials combined are $250 and $188 for the 1986 projects and $312 and $292 for the 1988 projects. The pipeline costs table published in 1987 gives $165 as the average cost for a linear foot for 36-inch pipeline. This figure would require adjustment by more than applicable time and location multipliers to reflect not only labor and materials, but also indirect costs, as given in the Oil & Gas Journal data.

 The testimony indicates that FERC calculates an annual depreciation rate for prospective use that will allow the pipeline company to recover its undepreciated book value over the remaining useful life of its pipeline taken as a whole. The testimony also suggests that the rate is expressed as a fraction of total plant cost (without allowance for depreciation already accrued) and that depreciation is computed as a single charge to aggregate book value. FERC regulations are again not specific on these points. (See n. 1 supra). A given FERC depreciation rate would, however, not measure the useful life of any particular asset. Nor *45 does it seem possible, simply by taking the reciprocal of the rate, to express the remaining useful life determined by FERC for the pipeline as a whole. That figure is not explicit in the record, but it should be easily ascertainable from the FERC determination.