KAHN, J.T.C.
This is the court’s opinion with respect to a local property tax proceeding for the years 1990, 1991, 1992, 1993, 1994 and 1995. The municipality assessed the subject property for all years in question as follows:
Land $ 5,096,000
Improvements 34,759,000
Total $39,855,000
The subject property consists of a 226,568 sq. ft. building situate on land consisting of 14.56 acres described as Lot 2, Block 301, commonly known as 225 Brae Boulevard, Park Ridge, New Jersey. The property is zoned ORL (Office, Research and Laboratory). There is no dispute that the subject is a legal use with no violations of municipal laws.
Construction of the improvements commenced in and around 1987 and was completed in 1988. The subject was the product of a joint venture between Joseph L. Muscarelle, Inc. (Muscarelle) and Hertz Realty Corp. (Hertz). The land was previously owned by Muscarelle and subsequently transferred into the joint venture at a value of $6,000,000. Upon completion, the property was occu *190 pied by Hertz as a corporate headquarters pursuant to a lease agreement wherein Muscarelle was the landlord and Hertz the tenant. The lease was executed May 11,1986 for a term of twenty years commencing October 1, 1988 and ending September 30, 2008. The undisputed lease terms were described in taxpayer’s appraisal report as follows:
Annual Monthly
Net Rent: Rate/sf Net Rent Rent
Years 1-5: $16.00 $3,552,000 $296,000
Years 6-10 $18.75 $4,162,500 $346,875
Years 11-15 $21.50 $4,773,000 $397,750
Years 16-20 $26.00 $5,772,000 $481,000
Options: Renewal options for two additional successive periods of 5 years each.
First Refusal: Tenant is given the right of first refusal to purchase the property.
From the testimony, it appears the building, at all relevant times, was fully occupied by either Hertz or various entities within the Hertz family. Although testimony indicates some alleged attempt to list a portion of the improvements for rent, no such leases were ever consummated.
The building essentially consists of three main areas which are referred to as wings, north and east. There is a central area sometimes referred to as a wing, which is situated between the north and east wings. The north and east wings were described as typical configured office space in general, but of a high quality construction consisting of three floors. On the first floor of one wing is a 10,000 sq. ft. gymnasium and central computer room. The gymnasium actually contains an additional 5,000 sq. ft. directly above on the second floor. Access to the two sections is directly from one gymnasium section to the other. The remaining space on that wing is office, as are all of the three floors in the other wing.
The central area appears to be different in nature because it contains a substantial atrium that was constructed with the highest quality materials. The first floor houses a cafeteria and the second floor contains meeting rooms, including one room with *191 sophisticated audio and video equipment for presentations. The third floor contains larger offices (with more amenities) of a higher quality than the offices located in the other two wings. This central area also houses three elevators. The building contains pedestrian ramps from top to bottom as well as an underground 625 car garage. There are 74 additional ground level parking spaces. Corporate offices and conference rooms therein are described as large and finished in high quality.
During the trial, the following stipulations were entered into by the parties:
A. Land value for all years in issue: $5,475,000.
B. Capitalization rates as follows: 1990, 12.1%; 1991, 11.7%; 1992,12.3%; 1993,11.6%; 1994,11.5%; and 1995,12.0%.
Additionally, if not by stipulation, both parties acknowledged the original cost to build the improvements, including change orders, was $29,017,977. Although the construction process may have begun in 1986 or 1987, there is no dispute that the improvements were fully constructed by the end of 1988.
In addition to appraisal experts, taxpayer produced Hertz and Musearelle employees to testify that both companies intended to utilize the property as a corporate headquarters and have the building adaptable for use as general offices competitive in the marketplace. In fact, an expert witness was produced to demonstrate how the property could be so converted. The purpose of these witnesses was to convince the court that despite its quality, the improvements constituted a general purpose office building, therefore, subject to valuation by all three recognized valuation methods.
The municipality in the first instance contends the taxpayer should be collaterally estopped from raising the issue as to the highest and best use of the property in light of the Honorable David E. Crabtree’s decision in a Tax Court litigation between these same two parties concerning the 1989 assessment. Additionally, the collateral estoppel claim involves valuation issues as well. The municipality also urges that independent of the eollater *192 al estoppel claim, the evidence and testimony adduced from taxpayer’s own witnesses require this court to conclude that the subject’s highest and best use is a corporate headquarters and that the cost approach is the only acceptable method of valuation. The municipality produced no appraisal expert testimony and consequently its appraisal reports were not admitted into evidence.
Taxpayer’s appraisal expert witness concluded that the highest and best use of the subject property was that of a good class general office building and premised his valuation analysis upon this point. Taxpayer’s expert utilized the cost, market sales, and income capitalization approaches to value generally concluding that the income approach would serve as the best valuation tool. This conclusion was based upon the witness’s opinion that there were ample comparable rentals in the marketplace as of the relevant assessment dates from which to begin the capitalization study.
Judge Crabtree decided a tax appeal on the subject property for the 1989 tax year. The 1989 tax year is the year prior to the first year at issue in this case and one year subsequent to the completion of construction of the improvements. That opinion was an unreported decision affirmed by the Appellate Division. Brae Associates v. Park Ridge Borough, 14 N.J.Tax 172, 172-73 (App.Div.1993), certif. denied, 136 N.J. 297, 642 A.2d 1006 (1994).
In the 1989 case, both parties presented expert appraisal witnesses. Judge Crabtree’s decision was based on their Testimony. Among other things, Judge Crabtree determined the property was occupied by a single user under a long term lease. Thus, the property was owner-occupied. Moreover, Judge Crabtree found the property was not built on speculation, but was constructed to meet the owner/oceupant’s needs. He also made findings concerning design features as well as amenities, all of which were testified to and acknowledged in this case. Finally, Judge Crabtree concluded that (1) the property is a corporate headquarters; and (2) the cost approach is the most probative approach to determine the property’s true value.
*193 Taxpayer’s main argument in opposition to the collateral estoppel doctrine’s application appears to be that such application precludes a taxpayer from that which he is entitled to, namely the litigation if he chooses, of his assessment each and every year. City of Ventnor v. Interdenominational Foreign Missionary Soc’y Of New Jersey, Inc., 13 N.J.Tax 445, 452 (Tax 1993) aff'd, 15 N.J.Tax 160 (App.Div.1994); Jackson Tp. v. Marsyll of B.B., Inc., 3 N.J.Tax 386, 389 (Tax 1981). However, taxpayer’s argument sounds more like an argument against application of res judicata rather than collateral estoppel.
The doctrine of collateral estoppel precludes the relitigation of issues, whereas res judicata precludes relitigation of judgments. See Mazzilli v. Accident & Casualty Ins. Co., 26 N.J. 307, 139 A.2d 741 (1958); Allesandra v. Gross, 187 N.J.Super. 96, 453 A.2d 904 (App.Div.1982). Quoting from the Restatement (Second) of Judgments, § 27 (1982), the Court in Yelder v. Zurich, 245 N.J.Super. 331, 333, 585 A.2d 434 (Law Div.1990) stated with respect to collateral estoppel:
When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential in the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim.
Furthermore, our Supreme Court in In Re Estate of Dawson, 136 N.J. 1, 20-21, 641 A.2d 1026 (1994), held that
For the doctrine of collateral estoppel to apply to foreclose the relitigation of an issue, the party asserting the bar must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
[citations omitted.]
Significant authority exists permitting the use of collateral estoppel in local property tax cases without abridging a taxpayer’s right to litigate its assessment on an annual basis. Blair v. Director, Dir. of Taxation, 9 N.J.Tax 345, 349 (Tax 1987), aff'd, 225 N.J.Super. 584, 543 A.2d 99 (App.Div.1988), certif. denied, 113 N.J. 349, 550 A.2d 460 (1988); Warren Tp. v. Suffness, 225 *194 N.J.Super. 399, 408, 542 A.2d 931 (App.Div.1988), certif. denied 113 N.J. 640, 552 A.2d 166 (1988).
No facts or circumstances surrounding the physical aspects of the property or the use and occupancy of same have changed since the 1989 tax year covered by Judge Crabtree’s decision. Neither party has suggested a change in law affecting the property and its value. Additionally, plaintiffs appraisal expert acknowledged that no changes in the real estate market took place during the relevant assessment years.
Application of the collateral estoppel doctrine does not preclude the taxpayer from offering evidence that, for example, market changes and factors covering the property itself warrant value adjustment. Moreover, application of collateral estoppel herein does not fix value and therefore assessment for each year. Rather, collateral estoppel applied in this case avoids an annual retrial of factual issues where there has been no change in law or facts. This court, therefore, grants the municipality’s continuing motion to apply the doctrine of collateral estoppel as to the issue of highest and best use. Accordingly, this court finds the highest and best use of the subject property is a corporate headquarters.
In the second instance, the municipality seeks application of the collateral estoppel doctrine to preclude the taxpayer from any other approach to value with the exception of the cost approach. This court disagrees. Judge Crabtree determined the cost approach was the only reliable method of valuation of a single user corporate headquarters based upon the evidence before him. Application of the collateral estoppel doctrine should not foreclose the taxpayer from the ability to prove its case by any recognized valuation method.
It is clear that the issue of highest and best use and appropriate valuation technique existed in both the prior and current litigation in identical fashion. Those two issues were litigated and determined in the matter before Judge Crabtree and were major issues necessary for the decision in that case. Both parties were identical and clearly there were no changes in facts and law subsequent *195 to Judge Crabtree’s decision. See State v. Gonzalez, 75 N.J. 181, 186, 380 A.2d 1128 (1977); Mazzilli v. Accident & Casulty Ins. Co., supra; Busch v. Biggs, 264 N.J.Super. 385, 399, 624 A.2d 1017 (App.Div.1993); Allesandra v. Gross, supra; Fort Lee Bor. v. Director, Div. of Taxation, 14 N.J.Tax 126,140 (Tax 1994); Blair v. Director, Div. of Taxation, supra.
More specifically, the Appellate Division in Blair concluded with regard to local property tax cases:
The doctrine of collateral estoppel is generally applied against a taxpayer when he challenges the same kind of assessment that he previously challenged unsuccessfully when it had been levied for a prior period. See e.g. Bass River Tp. v. Hogwallow Inc., 182 N.J.Super. 584, 585-586, 442 A.2d 1055, (App.Div.1982). The doctrine is not applied where there has been an intervening change in significant facts, or there has been an intervening change in statutory, regulatory or judicial law that favors the taxpayer, or where there are “other special circumstances [that] warrant an exception to the normal rules of preclusion.” Montana v. United States, 440 U.S. 147, 155, 99 S.Ct. 970, 975, 59 L.Ed.2d 210, 218 (1979). Those exceptions are justified because it would be unfair to treat one taxpayer differently from others of the same class solely because he had once suffered an adverse determination when the facts or the law were different. Thus, “... if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change.” Commissioner v. Sunnen, 333 U.S. 591, 598-602, 68 S.Ct. 715, 720-721, 92 L.Ed. 898, 906-908 (1948).
[Blair, supra, 225 N.J.Super. at 586-587, 543 A.2d 99.]
Although this court utilized the doctrine of collateral estoppel to bar relitigation of the same issues, it is of greater importance that in this case the facts require this court to find by a preponderance of the evidence that: (a) the highest and best use of the subject property for all years in question is that of a single user corporate headquarters; and (b) that the cost approach is the only reliable method of valuation.
It is clear from the testimony of taxpayer’s lay and expert witnesses, that the improvements were intended and designed to be utilized by Hertz as a corporate headquarters. The visual presentation rooms, expansive offices, atrium in the central wing, large board of directors rooms and pedestrian ramps linking all areas of the subject improvements, were constructed to further the developers’ intention. The high degree of finish and the huge, expensive underground parking garage are likewise consistent *196 with the need for the facility to serve as a headquarters for a large corporation.
The fact that certain areas of the north and east wings resemble general offices does not change my finding that the entire purpose of the structure, and the manner in which it has been utilized from the inception is as a corporate headquarters for Hertz. The statements made by the procession of representatives of Hertz and Muscarelle, stating that the intention was to create a building competitive in the rental market, is neither borne out by the plans, photographs, and actual construction, nor the use to which the improvements have been put from the date of completion to the present time. CPC Int’l., Inc. v. Bor. of Englewood Cliffs, 193 N.J.Super. 261, 268, 473 A.2d 548 (App.Div.1984); Beneficial Facilities Corp. v. Peapack & Gladstone Bor., 11 N.J.Tax 359, 375 (Tax 1990), aff'd, 13 N.J. Tax 112 (App.Div.1992) cert. denied, 130 N.J. 397, 614 A.2d 619 (1992). Accordingly, this court finds on the first step in the valuation of the subject property, that the highest and best use of the subject is that of a corporate headquarters.[1]
In addition to determining that the subject’s highest and best use is as a corporate headquarters, this court finds the cost approach is the most reliable method for determining the value of the subject improvements. The Tax Court of New Jersey has previously spoken on this issue and determined that no other valuation technique should be utilized. CPC International, supra; Beneficial Facilities, supra.
In the ease at bar, there is even more reason to utilize the cost approach. First, there is no dispute that the cost of construction as of 1988 was $29,017,977. Second, it is undisputed that from the time of construction through 1995, the most recent year in issue, no alterations were made that would render that cost figure inappropriate. Third, testimony demonstrates minor interior wall *197 changes and maintenance as the only monies expended on the improvements. Finally, an appraisal expert witness would not have to use any subjective method to obtain an initial cost figure. An expert need only calculate physical/functional depreciation, entrepreneurial profit, if any, and obsolescence, if any. Since the cost approach becomes more acceptable and relevant with respect to more recently constructed buildings, it must be quite relevant herein since the first year in issue, 1990, involves an assessment date of October 1, 1989, only one year after the completion of construction.
By comparison, the other two recognized valuation techniques, i.e. the market sales and income capitalization approaches, as applied by taxpayer’s expert witnesses, fail by reason of the very premise upon which they are utilized. With respect to the market sales approach, taxpayer’s analysis begins with purported comparables that are general purpose office buildings, not corporate headquarters. Similarly, with respect to taxpayer’s income capitalization analysis, the beginning point, comparable rentals, also involved general purpose office buildings. Such comparables cannot be equated with the subject simply because the subject is not a general purpose office building, but rather a corporate headquarters. The aforesaid amenities built for Hertz cannot be recouped by the rents potentially receivable in the marketplace because such amenities are costs created for the owner-occupier’s purpose.
Since the only expert testimony was provided by the taxpayer, the cost analysis is relatively simple. Taxpayer’s expert provided, from the Marshall Valuation Service, a series of multiplier factors to account for the annual differences in cost for each of the six years in question. Since the municipality produced no expert testimony to refute same, this court accepts the factors utilized by taxpayer’s expert witness as controlling.
Taxpayer’s expert witness also made a determination as to annual physical and functional depreciation at 2.5% for each year following the completion of construction. To arrive at this conclusion, the witness analyzed short-lived and long-lived improvements, and utilized a weighting process to ultimately arrive at *198 2.5% per year on a straight line method. The witness acknowledged the obvious fact that in the early years depreciation would be less, but would accelerate toward the end of the building’s projected life. Since the municipality presented no expert testimony controverting taxpayer’s expert opinion, this court finds that 2.5% annual depreciation is likewise controlling.
Furthermore, taxpayer’s expert witness concluded no entrepreneurial profit should be added to the cost figures for each of the years in question. While the witness acknowledged that a 10% entrepreneurial profit factor is often utilized, he concluded that the marketplace during the years in issue demonstrated there may be no entrepreneurial profit, but rather, entrepreneurial loss. The witness utilized the use of one of his comparable sales together with inferences from his use of the income capitalization approach as evidence of the marketplace. While this court has concluded these two approaches are unreliable as evidence of value for the subject property, the results of the process demonstrate that entrepreneurial profit may not exist. Again, however, the municipality did not offer any expert testimony or other evidence from which this court could test the reliability of taxpayer’s expert witness.
In the case of Badische Corp. v. Town of Kearny, 11 N.J. Tax 385 (Tax 1990), the court found that no proof of entrepreneurial profit existed in the case and, therefore, no entrepreneurial profit was considered by the court. In this ease, taxpayer’s expert concludes no entrepreneurial profit to exist as opposed to no evidence of same submitted by the municipality. Therefore, this court finds, as did the court in Badische, that there was no evidence before this court to support the inclusion of an entrepreneurial profit factor. Texas E. Transmission Corp. v. East Amwell Tp., 13 N.J. Tax 24 (1992).
*199 The last essential ingredient in the cost approach deals with obsolescence. Taxpayer’s expert witness suggests a 25% deduction from cost for economic obsolescence. Again, the municipality produced no proof to contradict taxpayer’s recommendation. Taxpayer’s expert witness explained his economic obsolescence conclusion through the use of one of his comparable sales of a general office building as well as what he called vacancy factors in the office market. Concluding that his comparable was located on land with the same value as the subject, taxpayer’s expert subtracted land value in order to arrive at the sales price for the comparable improvements. The witness subtracted depreciation and land value and arrived at 26% obsolescence attributed to external forces, which he rounded to 25%.
Taxpayer’s expert witness’s conclusion might have merit if the subject could be properly considered a general office building. CPC Int'l, supra, 193 N.J.Super. at 264-267, 473 A.2d 548. However, this court has already concluded that the subject is a corporate headquarters building. Amenities which may have little utility and may be considered excessive are considered as part of the value to the owner-occupier. The taxpayer’s witness again utilized a comparable (general purpose office building) totally inapplicable to the subject because the highest and best use of the comparable is not the same as the highest and best use of the subject. Thus, taxpayer’s comparable is unreliable as a source from which to prove the existence of economic obsolescence. Accordingly, no economic obsolescence is found to exist by this court.
As aforesaid, this court applies the cost approach to determine true value of the subject property for each of the years in question. The beginning point is the stipulated or undisputed original building cost ($29,017,977) and the stipulated land value ($5,475,000). For each year in question, a Marshall Swift cost multiplication factor will be employed. This court finds reliable the taxpayer’s expert witness’s calculation based upon his estimat *200 ed total life expectancy of both long and short term improvements to arrive at depreciation of 2.5% per year on a cumulative basis. Land is added to produce the total property value for each year. The first year in question, 1990, was a revaluation year and, therefore, true value is the assessment. In years 1991,1992,1993 and 1994 the average ratio for the Borough of Park Ridge exceeded 100% as was the ratio of the assessment to this court’s finding of true value. Pursuant to N.J.S.A 54:51A-6(c), where both the average ratio and ratio of assessed value to true value exceed the county percentage level (100%),
... the tax court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property.
See also Caulfield v. Surf City Bor., 14 N.J. Tax 118 (Tax 1994). For these four years again true value will be the assessment.
For 1995, the last of the years in issue, the average ratio is 97.78% and the common level range is 83.11% to 112.45%. N.J.S.A. 54:51a-6(b) applies in this situation. Caulfield v. Surf City Borough, supra. Since the ratio of assessment to this court’s finding of true value for 1995 exceeds the upper limit of the common level range, taxpayer will be entitled to Chapter 123 relief as hereinafter provided:
1990
Stipulated building cost Comparative cost multiplication factor $29,017,977 x 1,011
Subtotal Less 2.5% physical/functional deprec. $29,337,174 - 733.429
Improvement value Land value $28,603,745 5,475.000
Total value $34,078,745
Rounded to $34,078,750
For 1990, a revaluation year, true value is the assessment as follows:
Land $ 5,475,000
Improvements 28,603.750
Total $34,078,750
*201 1991
Stipulated building cost $29,017,977
Comparative cost multiplication factor x 1.035
Subtotal $30,033,606
Less 5.0% physical/funetional deprec. — 1,501.680
Improvement value $28,531,926
Land value 5,475,000
Total value $34,006,926
Rounded to $34,006,930
The average ratio (100.78%) and the ratio of assessment to true value (117.28%) exceed the county percentage level (100%), therefore, the assessment must be at the county percentage level as follows:
Land $ 5,475,000
Improvements 28,531,930
Total $34,006,930
1992
Stipulated building cost $29,017,977
Comparative cost multiplication factor x 1.044
Subtotal $30,294,767
Less 7.5% physical/funetional deprec. — 2.272.108
Improvement value $28,022,659
Land value 5,475,000
Total value $33,497,659
Rounded to $33,497,660
*202 The average ratio (103.30%) and the ratio of assessment to true value (119.06%) exceed the county percentage level (100%), therefore, the assessment must be at the county percentage level as follows:
Land $ 5,475,000
Improvements 28,022,660
Total $33,497,660
1993
Stipulated building cost $29,017,977
Comparative cost multiplication factor x 1.063
Subtotal $30,846,109
Less 10% physical/functional depree. - 3,084,661
Improvement value $27,761,448
Land value 5,475,000
Total value $33,236,448
Rounded to $33,236,450
The average ratio (100.03%) and the ratio of assessment to true value (120.00%) exceed the county percentage level (100%), therefore, the assessment must be at the county percentage level as follows:
Land $ 5,475,000
Improvements 27,761,450
Total $33,236,450
1994
Stipulated building cost Comparative cost multiplication factor $29,017,977 x 1,090
Subtotal Less 12.5% physical/functional deprec. $31,629,594 - 3,953,699
Improvement value Land value $27,675,895 5,475,000
Total value $33,150,895
Rounded to $33,150,900
*203 The average ratio (100.57%) and the ratio of assessment to true value (120.31%) exceed the county percentage level (100%), therefore, the assessment must be at the county percentage level as follows:
Land $ 5,475,000
Improvements 27,675,900
Total $33,150,900
1995
Stipulated building cost $29,017,977
Comparative cost multiplication factor x 1.131
Subtotal $32,819,331
Less 15% physical/functional deprec. - 4,922,900
Improvement value $27,896,431
Land value 5,475,000
Total value $33,371,431
Since the average ratio for the Borough of Park Ridge for the tax year 1995 (97.78%) and the ratio of assessment to true value (119.51%) exceeds 100% (county percentage level), taxpayer is entitled to relief by having the average ratio applied to this court’s finding of true value as follows:
$33,371,431 x 97.78%
$32,630,585
Rounded to $32,630,600
Retaining the stipulated land value of $5,475,000, improvements are therefore adjusted to $27,155,600.
This court will enter judgments as follows:
1990 Land $ 5,475,000
Improvements 28,603,750
Total $34,078,750
1991 Land $ 5,475,000
Improvements 28,531,930
Total $34,006,930
*204 1992
Land $ 5,475,000
Improvements 28,022,660
Total $33,497,660
1993
Land $ 5,475,000
Improvements 27,761,450
Total $33,236,450
1994
Land $ 5,475,000
Improvements 27,675,900
Total $33,150,900
1995
Land $ 5,475,000
Improvements 27,155,600
Total $32,630,600

 A property’s highest and best use is the basis of valuation to determine fair market value. Ford v. Edison, 127 N.J. 290, 604 A.2d 580 (1992).