73 N.J. Super. 262 (1962)
179 A.2d 527
NICHOLAS (NICK) DARPINO AND RAFAELLE DARPINO, HIS WIFE, LOUIS (LEWIS) DARPINO AND CAROLINA DARPINO, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
DOMINICK D'ARPINO AND GEMMA D'ARPINO, HIS WIFE, DOMINICK D'ARPINO, JR. AND NINA D'ARPINO, HIS WIFE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 1962.
Decided March 29, 1962.
*263 Before Judges CONFORD, GAULKIN and KILKENNY.
*264 Mr. Benjamin S. Appel argued the cause for appellants.
Mr. J. Alan Drummond argued the cause for respondents.
The opinion of the court was delivered by KILKENNY, J.A.D.
Plaintiffs sought partition in the Chancery Division as to real estate commonly known as Number 483-485 11th Street, Newark, N.J. The trial court decided that the plaintiffs had no rights by way of ownership or otherwise in the subject property and entered judgment in favor of the defendants. Plaintiffs appeal.
Plaintiffs Nicholas and Louis Darpino are grandsons of Angelo D'Arpino, who died on July 9, 1952 seized of the premises in issue. Their father, Emilio Darpino, predeceased his father, Angelo. Coplaintiffs Rafaelle and Carolina are the respective wives of Nicholas and Louis. Angelo D'Arpino left him surviving as his next of kin and heirs at law, in addition to plaintiff grandsons, four children, namely, Philip D'Arpino, a widower; Dominick D'Arpino, whose wife's name is Gemma D'Arpino; Peter D'Arpino, who is married to Julia D'Arpino, and Concetta Tetta whose husband's name is Amedeo Tetta. Plaintiff grandsons contended that their grandfather died intestate as to the property in question and that by virtue thereof each of them is entitled to an undivided one-tenth interest therein, subject to the inchoate right of dower of his respective wife.
Angelo D'Arpino left a last will and testament dated July 3, 1942, which was duly probated on February 3, 1953. The following clauses therein are pertinent to the issue:
"Second: I give and bequeath unto my two grandchildren, Louis D'Arpino and Nicholas D'Arpino, children of my deceased son, Emilio D'Arpino, the sum of Two Hundred ($200.00) Dollars, each.
Third: I give, devise and bequeath unto my beloved wife, Liberata D'Arpino, all my property, real, personal or mixed, which shall belong to me or be owned by me at the time of my death.
*265 Fourth: In the event my wife and I should die of a common disaster, then in that event, I give, devise and bequeath unto my beloved children, Dominick D'Arpino, Philip D'Arpino, Peter D'Arpino and Concetta Tetta, all of my property, real, personal or mixed, which shall belong to me or be owned by me at the time of my death, in the manner and amounts as follows: viz:
To my three sons, Dominick D'Arpino, Philip D'Arpino and Peter D'Arpino, Seven Twenty-fourths (7/24ths) interest each in and to my property. To my daughter, Concetta Tetta, One-eighth (1/8th) interest in and to my property."
On December 15, 1953 the four children and their spouses conveyed the property to the son Dominick D'Arpino and to his son Dominick D'Arpino, Jr., who is married to Nina D'Arpino.
Liberata D'Arpino, the wife of Angelo, predeceased him, having died on January 10, 1949, and not as the result of any common disaster. Plaintiffs contend that since the condition in the Fourth paragraph of the decedent's will did not occur, the disposition in favor of the four children did not become legally effective, and therefore, since the testator made no other provision in his will disposing of the real estate in issue in the event that his wife should predecease him, he is deemed to have died intestate in relation thereto, and by reason thereof the grandsons share a one-fifth interest in the property. The position of defendants, which view was adopted by Judge Herbert in the Chancery Division, is that the testator intended the four children to inherit his property if his wife should not survive him, whether she died in a common disaster or by predeceasing him. Thus, we are confronted with these opposite views for resolution.
Testimony at the trial disclosed that the deceased son, Emilio, had been living with his wife and two children on the first floor of the premises, paying rent to his parents who lived on the third floor, when Emilio was injured about 1930. The injury prevented his working, so that he paid no rent thereafter, and his parents, brothers and sister helped to support him and his family. Emilio died about 1933. After his death, his wife and children remained *266 in their apartment rent-free. She worked a little, but not enough to support herself and the children, who were then about three and six years of age. Emilio's parents, brothers and sister continued their support of Emilio's wife and children for about two or three years after Emilio died, and then Emilio's wife and children went to live with her stepmother.
The trial court received testimony, over objection of plaintiffs' attorney, as to certain declarations made by Angelo D'Arpino, the testator. Thus, the defendant Gemma D'Arpino was allowed to testify that the decedent said to her that "he would leave the children [sons of Emilio] $200 apiece in memory of the father, because he had done enough for the father while he was alive." Defendant Dominick D'Arpino testified that he was with his father at the lawyer's office when the will was executed and that his father had told him that "he wasn't going to give nothing to the boys at all and to my brother, either  nothing to Emilio. * * * He said because he spent too much money on the father when he was living." This witness testified further that he told his father "to leave them something, just for remembrance." He asserted that his father told Mr. Solimine, the lawyer who prepared the will and witnessed it, that he didn't want to give anything to these boys, because he had given enough to the father. Concetta Tetta, the daughter, also testified that "about a couple of years" before her father made his will "he said that he had done enough for my brother Emilio; he was sick for a long time; and he would give this $200 to the children out of his own will, but not put it on the will; the living children get equal parts, but these two grandchildren  the father had enough; my father spent enough money on him all these years that he was sick."
Plaintiffs claim error in the trial court's admission of this evidence of declarations of the testator. It is true, as they say, that such declarations are not admissible in a will construction case, not involving a latent ambiguity, *267 to show "what he intended by the language used in his will and how he intended to dispose of his property." Epstein v. Kuvin, 25 N.J. Super. 210, 212 (App. Div. 1953). That case held that the trial court erred in admitting evidence of testator's declarations to prove that a bequest for a "college education" was intended to include education at medical school after college. Such use was also condemned in In re Armour, 11 N.J. 257 (1953). As stated in Fidelity Union Trust Co. v. Noll, 125 N.J. Eq. 106, 107 (Ch. 1939),
"The testator's declarations regarding his testamentary intentions are inadmissible except in case of latent ambiguity in the naming of a person or thing in the will when such declarations may be proved to identify the person or thing."
The record does not disclose that this evidence was received to establish what the testator intended his will to provide. We assume that the trial court admitted the proof merely as evidence of the circumstances surrounding testator at the time he executed his will. As noted in Fidelity Union Trust Co. v. Robert, 67 N.J. Super. 564, 573 (App. Div. 1961), "The better rule is that the court is entitled to consider such extrinsic evidence, even in the absence of ambiguity in the will. It should be admissible to indicate doubt as well as to resolve it."
In approving this view, the Supreme Court in the Robert case, 36 N.J. 561 (1962), held that the affidavit in question (submitted by consent in lieu of testimony), in which the affiant stated that the testator disliked his sons-in-law, "had a horror of women having money," believed they should always have an adequate income, but "was afraid that husbands, or other men, would separate them from any principal they had," and that testator had only one desire  "the happiness of his wife, children and grandchildren"  "was admissible in evidence and was properly to be considered insofar as it furnished information as to the situation surrounding the testator * * * at the *268 time he executed his will. See 67 N.J. Super., at p. 573; cf. In re Fox, 4 N.J. 587, 594 (1950); Zwoyer v. Hackensack Trust Co., 61 N.J. Super. 9, 12 (App. Div. 1960); 5 N.J. Practice (Clapp, Wills and Administration) §§ 191, 196, 198 (3d ed. 1962)." Upon the assumption that the trial court received the evidence of testator's utterances for the limited and permissible purpose of showing the circumstances existing at the time the will was executed, rather than as direct statements of intention, we find no prejudicial error in the trial court's admission of this evidence. In all events, in our independent review pursuant to R.R. 1:5-4(b), we have attached to the testator's declarations only the proper limited probative value.
Turning, then, to the meritorious issue, the will provided for an alternative disposition of the residuary estate in favor of the testator's four children in the event that his wife "should die of a common disaster" with him, an event which did not take place, but made no express provision for a similar or other disposition, if his wife should predecease him, as she did. The initial inquiry is whether courts may take ordinary words, like "common disaster," and read a testamentary disposition conditioned upon the event connoted thereby as intended also to apply in another contingency  the prior death of the wife.
Justice Jacobs' recent comprehensive opinion in Fidelity Union Trust Co. v. Robert, above, 36 N.J. 561 (1962), states the controlling principles. The judicial function in construing the will is to ascertain and give effect to the "probable intention of the testator." The "courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances." So far as the situation fairly permits, courts will ascribe to the testator "those impulses which are common to human nature, and will construe the will so as to effectuate those impulses." The testator's intent "is not to be thwarted by unduly stressing `the literal *269 meaning' of his words; * * * the object is to ascertain `the probable intent' of the testator * * * and to carry it out in accordance with his wishes `even though they be imperfectly expressed'"; and "the court's endeavor is to put itself in the testator's position insofar as possible in the effort to accomplish what he would have done had he `envisioned the present inquiry.'"
The Supreme Court, in Fidelity Union Trust Co. v. Robert, supra, recognized with approval the readiness, as indicated by Bank of New York v. Black, 26 N.J. 276 (1958), "to strain towards effectuating the probable intent of the testator." In Black, "the issue before the court was whether a residuary bequest made by the testatrix to her daughter `of all my estate' was intended to pass property which was not part of the estate but over which she had a general power of appointment. The Supreme Court held that the testatrix' probable intention was to have the daughter take the property encompassed by the power." Fidelity Union Trust Co. v. Robert, supra, 67 N.J. Super., at p. 572.
In carrying out the testator's probable intent, the Supreme Court observed in Robert that courts have done so, "even though it meant departing from the literal terms of the will," citing In re Devries, 36 N.J. Super. 29, 35 (App. Div. 1955), and quoting from Bottomley v. Bottomley, 134 N.J. Eq. 279, 291 (Ch. 1944), where it was said:
"The power of this court to effectuate the manifest intent of a testator by inserting omitted words, by altering the collocation of sentences or even by reading his will directly contrary to its primary signification is well established. This power, when necessary, is exercised to prevent the intention of the testator from being defeated by a mistaken use of language. The question presented is simply this: Will the court execute the clear intent of the testator not fully or clearly expressed in a will, or will it by a strict technical adherence to the form of words and their literal meaning suffer the intention of the testator to be defeated? * * * In the exercise of this power and the discharge of its responsibility, this court has frequently construed technical legal words contrary to their technical meaning." *270 Therefore, the "plain meaning" doctrine is not a controlling principle in New Jersey in the construction of wills. "The true rule, however, is that plain and technical meanings always yield to the testator's intentions, provided those intentions can be drawn from the words of the will, read in the light of extrinsic circumstances and a testator's utterances other than direct statements by him as to his intentions." 5 N.J. Practice (Clapp, Wills and Administration) (3d ed.), 1962, § 198, p. 316. Accordingly, the limitation in the will conditioned upon testator's dying with his wife "in a common disaster" need not be construed as contingent solely upon that event, if to do so would defeat the probable intention of the testator.
Such a policy was pursued in Russell v. Russell, 16 N.J. Super. 589 (App. Div. 1951). In that case there were mutual wills, each spouse naming the other as sole beneficiary and executor. The wills provided that in the event both should die "at or about the same time," the property should pass in equal shares to their son James and daughter Alice, "being small recompense for their kindness and devotion to us," and that their third child, William, "who has been a very ungrateful and undutiful son, * * * shall not receive any part or share of my estate." Neither spouse, however, expressly provided for the contingency of being predeceased by the other. Mrs. Russell died before her husband; upon the latter's death William claimed that his father had died intestate, so that James, Alice and he were entitled to equal one-third shares of the estate. The court concluded that it was Mr. Russell's intent that, as well in the contingency of his wife's predeceasing him as in the event that he and she died at or about the same time, his estate should pass only to James and Alice, and William should have none of it. In short, the court gave effect to what it considered the obvious testamentary intent and, by implication, supplied the words "or my wife should predecease me" as part of the contingency clause.
*271 Plaintiffs argue that the Russell case is distinguishable because there the testator had manifested by express language on the face of the will his intention to exclude one of his children from participating in his estate. True, the intent is more obvious in Russell than in the matter before us, but we are still guided by the basic rule stated in Russell that courts will supply by implication words necessary to give effect to the testamentary intent, even though the contingency which did occur was not specifically covered by the ordinary meaning of the language employed. As aptly stated in 1 Jarman on Wills (7th ed.), p. 556:
"Where it is clear on the face of a will that the testator has not accurately or completely expressed his meaning by the words he has used, and it is also clear what are the words which he has omitted, those words may be supplied in order to effectuate the intention, as collected from the context."
In brief, courts "should give effect to plainly discernible, though ineptly expressed, testamentary intent." In re Selner's Estate, 261 App. Div. 618, 26 N.Y.S.2d 783, 788 (App. Div. 1941), affirmed per curiam 287 N.Y. 664, 39 N.E.2d 287 (Ct. App. 1941).
In Russell, the testator made it abundantly clear that he wanted his undutiful son to get no part of his estate. In the instant case the testator made it reasonably clear that he wanted the plaintiff grandsons to receive only the $200 legacies specifically bequeathed to them. He indicated this when he provided for them at the very outset of his will, even before disposing of his residuary estate in favor of his wife, and then alternately in favor of his four named children. In making this alternate disposition, he took pains to allocate a 7/24ths interest to each of his three living sons and a lesser 1/8th interest to his daughter. No reason appears in the record why the testator would want this uneven distribution, probably much thought about, to be applicable only if he and his wife died in a "common disaster," within the strict meaning of those words, and *272 not to be applicable if his wife died at or about the same time but not as the result of a common disaster, or predeceased him, as in this case.
To uphold the view of plaintiff grandsons it would be necessary to conclude that the decedent intended a partial intestacy, unless his wife died in a common disaster with him. In Fidelity Union Trust Co. v. Robert, supra, 36 N.J., at p. 561, our Supreme Court quoted the following pertinent language from In re Fabbri's Will, 2 N.Y.2d 236, 243, 159 N.Y.S.2d 184, 190, 140 N.E.2d 269 (Ct. App. 1957):
"A testator, by the act of the making of a will, casts grave doubt on any assumption that he expressly intends to chance dying intestate as to any portion of his property. Indeed, the law has taken cognizance of this teaching of common experience and crystallized it into a presumption, expressed in various terms, but requiring essentially that the courts favor a construction which avoids partial intestacy and adopt one which results in a complete disposition of the estate."
In 2 Redfield on Wills (3d ed.), 235, it is said:
"The idea of anyone deliberately purposing to die testate as to a portion of his estate and intestate as to another portion is so unusual in the history of testamentary disposition as to justify almost any construction to escape it."
See, too, Barrett v. Barrett, 134 N.J. Eq. 138, 142 (Ch. 1943); Bankers Trust Co. of New York v. Greims, 115 N.J. Eq. 102, 104, 114 (Ch. 1934), affirmed 117 N.J. Eq. 397 (E. & A. 1935); and Tobler v. Moncrief, 72 N.J. Super. 48, 53 (Ch. Div. 1962).
The benefactions which the testator had bestowed upon his son Emilio during his lifetime, and thereafter upon Emilio's wife and sons, as the trial court properly observed, supplied "a practical motive for the testator to give them [the grandsons] recognition to the extent of two hundred dollars but, nevertheless, a motive against giving them *273 more." His children lived close to him, some in the same building, while the plaintiff grandsons had left the common residence several years before the will was executed. It is highly improbable that the testator wanted his grandsons to have the specific bequests of $200 each and an intestacy share if his wife did not die in a common disaster, thereby giving the two grandsons more than the law would allot to one of his children.
Plaintiffs rely upon Montclair Trust Company v. Lupher, 44 N.J. Super. 408 (App. Div. 1957). There, decedent and his wife executed mutual wills leaving everything to each other, and decedent's will then provided that in the event "I and my said wife shall die or meet death as the result of a common disaster" the property was to be distributed another way. Decedent and his wife did not die in a common disaster, but she predeceased him by a little more than a month. The will contained no provision for the contingency of the wife predeceasing the decedent. We held that his property passed as though he died intestate. If the will were construed so as to make the same contingency applicable where the wife predeceased the husband as in the event of a joint death in a common disaster, it would result that the wife's nieces and nephews would take to the exclusion of testator's own niece. We stated that while such an intent was a possibility, it would take a showing of an intent "highly probable  * * * to the point of inescapable conviction," to justify drawing the implication contended for. In the instant case, by contrast, we are thoroughly convinced by the will and the surrounding circumstances that accepting plaintiffs' contention would do violence to the testator's actual intent.
Plaintiffs stress that Mr. D'Arpino's will was prepared by an attorney. While ordinarily a factor to be considered, we discount its importance here because it is clear to us that this testator wanted the disposition he made for his children in the event of death in a common disaster with his wife also to apply if his wife predeceased him.
*274 The testator's intent is "not to be thwarted by refinements and distinctions resting upon subtlety and ingenuity or by lack of technical accuracy in the use of words or by unduly stressing the literal meaning of a few words or by attaching to them a hard and fast meaning which is not in consonance with the setting in which they were employed." Beals v. Magenis, 307 Mass. 547, 31 N.E.2d 20 (Sup. Jud. Ct. 1941); National State Bank of Newark v. Morrison, 9 N.J. Super. 552, 558 (Ch. 1950); Bank of New York v. Black, supra, 26 N.J., at p. 284. We consider that to uphold the claim of the plaintiffs would be to disregard the general intent and scheme of the testator and create a partial intestacy as to the residuary estate, when presumably such an intestacy was never intended. We are satisfied that fulfillment of the whole design and plan of testator's will is effected by the interpretation of the will reached by the trial court.
Accordingly, the judgment is affirmed.