641 A.2d 1026

IN THE MATTER OF THE ESTATE OF DUDLEY B.
DAWSON, DECEASED, LATE OF BOONTON,
MORRIS COUNTY, NEW JERSEY.

Argued February 1, 1994—Decided June 9, 1994.
As Amended July 15, 1994.

1

2

*Richard Kahn* argued the cause for appellant guardian *ad litem, pro se.*

*Howard G. Wachenfeld* argued the cause for appellant Manufacturers Hanover Trust Company, Trustee (*Tompkins, McGuire & Wachenfeld,* attorneys; *Mr. Wachenfeld* and *Brian M. English,* on the brief).

*Edward John Trawinski* argued the cause for respondent, Edwin W. Kimball (*Schenk, Price, Smith & King,* attorneys; *Douglas S. Brierley,* on the brief).

The opinion of the court was delivered by

CLIFFORD, J.

This appeal poses the issue of the correct interpretation and application of the term "stock dividend" as used in the testator's will. The narrow question is whether trustees of a testamentary trust should allocate eight different stock distributions to income or to principal. The will provided that in administering the trust, the trustees should allocate stock dividends to income and allocate stock splits to principal. The will did not define those terms, however.

In three prior intermediate accountings, the Chancery Division, Probate Part, had defined the term "stock dividend" by referring to the traditional rule, which focuses on a capitalization of assets. Accordingly, in those earlier accountings that court had allocated stock distributions to income whenever the issuing corporation had made journal entries transferring assets from a surplus account to a capital account. In the fourth intermediate accounting, however, the trial court adopted a different test to distinguish between stock dividends and stock splits. Adopting the New York Stock Exchange rule, the trial court characterized stock distributions as dividends if they constituted less than twenty-five percent of the outstanding shares of stock and as splits if they equalled twenty-five percent or more of the outstanding shares. In an unpublished opinion, the Appellate Division reversed the trial court's judgment, rejecting that court's twenty-five-percent rule and relying instead on the traditional approach. We granted certification to determine the correct rule.

I

On December 1, 1952, the testator, Dudley Dawson, executed a will. At that time, he was married to his second wife, Anna Coffin Dawson. Dawson's first wife, Julia G. Dawson, had died on December 25, 1939, and he married Anna on June 13, 1941. The testator did not have any children with either of his wives. Anna, however, had three children from a previous marriage. When Dawson executed his will, his closest relatives other than his wife

were: (1) Elizabeth Dawson Dumont, a sister, who died without issue in 1961; (2) Elizabeth Dawson Birch, a niece, and Raymond Dawson, Jr., a nephew, both children of Raymond Dawson, a deceased brother; and (3) Louis W. Dawson, Palmer C. Dawson, and Nicholas J. Dawson, nephews and children of Nicholas Dawson, also a deceased brother.

Dudley Dawson died on May 11, 1957. At the time of his death, his closest surviving relatives were his wife, Anna; his sister, Elizabeth; and his niece and four nephews by his deceased brothers, Raymond and Nicholas. His will left nothing to his sister, Elizabeth, or to Anna's children. The testator did make several specific bequests, however, including a bequest to his wife, Anna, of personal property and $5,000.

Paragraph "NINETEENTH" of the testator's will directed his executors to pay Anna quarterly the income from the estate during the period that the executors controlled the estate. Paragraph "TWENTIETH" established a residuary trust, instructing the trustees to (1) pay the entire net annual income from the trust to Anna during her life, in quarterly installments; and (2) pay the income from the trust after Anna's death to "my nieces and nephews, and the issue of any deceased niece or nephew, * * * in equal shares per stirpes * * *." The will provided that the trust would exist as long as the rule against perpetuities (now codified at *N.J.S.A.* 46:2F–1 to –8) would allow, namely, twenty-one years after the death of the survivor of the named niece, nephew, grandniece, and three grandnephews. The trustees were directed to distribute the trust funds thereafter "to my nieces and nephews and the issue of any deceased niece or nephew, in equal shares per stirpes * * *." Paragraphs "THIRTY–FOURTH" and "THIRTY–FIFTH" named Dawson's wife, Anna, and the Hanover Bank (later Manufacturers Hanover Trust Company, and currently Chemical Bank) as executors and trustees.

When Dawson executed his will in 1952, the New Jersey Principal and Income Act, *N.J.S.A.* 3A:14A–1 to –9, provided that dividends paid in stock should be allocated to principal, *N.J.S.A.*

3A:14A–4A(a), and that dividends paid other than in stock should be allocated to income, *N.J.S.A.* 3A:14A–5A(a). Paragraph "THIRTY–FIRST" of Dawson's will, however—the paragraph in dispute in this action—gave the following directions in respect of the trustees' allocation of stock distributions:

All gains and losses on the sale or redemption of securities shall be added to or subtracted from corpus, but all stock dividends and all rights to subscribe to stocks shall be treated as income and shall be distributed to the income beneficiary or beneficiaries as such. Neither my executors nor my trustees shall be required, nor are they authorized[,] to set aside from income any sums to provide for the amortization of premiums in the purchase of securities.

The first intermediate accounting of the trust covered the period from June 6, 1960, when the trust first received the assets from the testator's estate, until November 22, 1967. At that accounting, the parties agreed to the allocation between principal and income of the shares from most of the stock distributions to the trust. They disagreed, however, about the proper allocation of two distributions. One distribution concerned American Electric Power Company (American Electric) stock: the trust initially held 300 shares; American Electric distributed to the trust 300 additional shares; and American Electric adjusted the par value of its stock, transferring funds from its capital-surplus account to its capital-stock account. The other distribution concerned Ohio Edison Company (Ohio Edison) stock: the trust initially held 400 shares; Ohio Edison distributed to the trust 400 additional shares; and Ohio Edison adjusted the par value of its stock, transferring funds from its premium-on-common-stock account and from its earned-surplus account to its capital account.

The question before the trial court on that first intermediate accounting was whether those two distributions were stock splits (allocable to corpus under the terms of the trust) or stock dividends (allocable to income under the trust's terms). The trial court allocated both stock distributions to income as dividends, relying on this Court's decision in *In re Trust of Arens,* 41 *N.J.* 364, 375, 197 *A.*2d 1 (1964) (noting that in stock split "no change whatever is made in any corporate accounts," but that stock dividend involves "capitalization of earnings by a transfer * * *

from the earned surplus account to a capital account"). The trial court found that inasmuch as "[i]n both cases there was a capitalization of earnings," the distributions were stock dividends and thus allocable to income under the terms of the trust. Similarly, in later approving second and third intermediate accountings, the same court applied the disputed stock distributions to income when the issuing corporations transferred funds from a surplus account or from undivided profits to the capital-stock account.

After the death of Anna Coffin Dawson in September 1989, the trustees' filed with the Chancery Division a fourth intermediate accounting, running from May 12, 1981, to September 3, 1989, and a fifth intermediate accounting, covering the period September 4, 1989, to December 17, 1989. The court, now presided over by a different judge from the one who had heard the previous applications, appointed a new guardian *ad litem* to represent the interests of the minor defendants (the guardian *ad litem* who had represented their interests in the previous accountings had died), and extended the guardian *ad litem*'s representation to include the unborn parties in interest. That new guardian *ad litem* then challenged the trustees' proposed allocation to income of eight stock distributions that the trust had received during the period of the fourth intermediate accounting. See Appendix, *infra* at 22–25, 641 *A*.2d at 1036–37 (describing each stock distribution). All the disputed stock distributions involved transfers of funds to the issuing corporations' capital-stock accounts, but the guardian *ad litem* urged the court to adopt a new rule in respect of how to determine whether a stock distribution is a dividend or a split.

The trial court, in an oral decision, noted that Dawson's will evidenced substantial concern for his wife as well as for his collateral descendants; therefore, the court concluded that in deciding whether to allocate the stock distributions to income or to principal, it could not rely with confidence on notions of which beneficiaries the will favored. Moreover, that the trust contained no provisions for the invasion of principal also indicated to the trial

court that the testator had a "meaningful objective" in preserving the corpus.

The court therefore determined that the relevant considerations in determining whether a distribution is a stock dividend or a stock split are whether the distribution effects a rearranging of the principal assets of the trust or whether the distribution is a slight enhancement, that is, an income payout. Reasoning that corporate-accounting concepts have changed and that the rules of stating the capital of corporations have little relation to the issue of allocation of stock distributions to a trust's income or principal beneficiaries, the court advocated a common-sense, functional approach: it adopted the rule advanced by the guardian *ad litem* and used by the New York Stock Exchange. That rule states that

> if a stock distribution amounts to less than [twenty-five] percent of the sharehold[,] * * * it should be treated as income and paid out to the income beneficiaries. If it is [twenty-five] percent or more, it should be treated as simply an adjustment in the way in which a principal asset is held.

Although noting that the twenty-five-percent benchmark was somewhat arbitrary, the trial court felt the rule made "functional sense." Applying that rule to the eight stock distributions involved, the court concluded that the income beneficiaries would receive no distribution.

The trial court next determined that principles of collateral estoppel did not preclude it from adopting the twenty-five-percent rule. In the three prior intermediate accountings the court had not considered the issues posed here "in the context of the adversarial interests of the current income beneficiaries * * *." Moreover, "there have been very substantial evolutions in concepts [of accounting, corporate financial management, and estate management] between the time of the earlier adjudications in this case and the present adjudications."

Finally, the trial court decided that the law-of-the-case doctrine did not compel a different result: (1) the case has spanned a very long period of time; (2) substantial differences exist in the financial and analytical contexts of the current litigation and the prior

adjudications; and (3) the parties are not the same here as they were in the prior accountings.

The Appellate Division, in an unpublished opinion, reversed the judgment of the trial court. Viewing that court's twenty-five-percent rule as arbitrary, the Appellate Division determined that the trial court should have applied the rule of *Arens, supra,* 41 *N.J.* 364, 197 *A.*2d 1, that "the key distinguishing factor between stock dividends and stock splits [is] the capitalization of corporate earnings and the resultant transfer of funds from surplus to capital accounts." Applying the *Arens* rule, the Appellate Division then concluded that all eight of the contested stock distributions were dividends (and thus allocable to income under the will) because all eight involved a transfer of funds to stated capital.

We granted both Manufacturers Hanover Trust Company's and the guardian *ad litem* 's petitions for certification, 134 *N.J.* 483, 634 *A.*2d 529 (1993), and now reverse.

## II

In deciding whether to allocate the stock distributions to income or to corpus, we look first to the testator's will to determine, if we can, whether that instrument favored his wife (thus encouraging an allocation to income) or his collateral descendants (thus favoring an allocation to principal). In doing so, we "ascertain and give effect to the 'probable intention of the testator.' " *Fidelity Union Trust Co. v. Robert,* 36 *N.J.* 561, 564, 178 *A.*2d 185 (1962) (quoting *Fidelity Union Trust Co. v. Robert,* 67 *N.J.Super.* 564, 572, 171 *A.*2d 348 (App.Div.1961)); *accord In re Accounting of Thompson,* 53 *N.J.* 276, 299, 250 *A.*2d 393 (1969); *In re Estate of Conway,* 50 *N.J.* 525, 527, 236 *A.*2d 841 (1967); *In re Estate of Cook,* 44 *N.J.* 1, 6, 206 *A.*2d 865 (1965). "[I]n ascertaining the subjective intent of the testator, courts will give primary emphasis to [the testator's] dominant plan and purpose as they appear from the entirety of [the] will when read and considered in the light of the surrounding facts and circumstances." *Fidelity Union Trust Co., supra,* 36 *N.J.* at 564–65, 178 *A.*2d 185; *accord In re Estate of*

*Branigan,* 129 *N.J.* 324, 332, 609 *A.2d* 431 (1992); *Darpino v. D'Arpino,* 73 *N.J.Super.* 262, 268, 179 *A.2d* 527 (App.Div.1962); *Zwoyer v. Hackensack Trust Co.,* 61 *N.J.Super.* 9, 12–13, 160 *A.2d* 156 (App.Div.1960).

Examination of Dawson's will and of his circumstances when he executed it renders one aspect of his intent abundantly clear: Dawson intended to override the statutory allocation of stock dividends to principal. In 1952 the Legislature adopted the New Jersey Principal and Income Act, *N.J.S.A.* 3A:14A–1 to –9. That Act provided that absent a different allocation scheme in a trust instrument, trustees should allocate stock dividends to principal. See *N.J.S.A.* 3A:14A–2B; *N.J.S.A.* 3A:14–4A(a). When Dawson executed his will in December of that year, he directed his trustees to allocate stock dividends to income. Accordingly, the testator's intent to override the statutory allocation is clear and a court should enforce his instructions. We note that that result would be the same even under today's statutory allocation because the new allocation scheme—requiring trustees to allocate stock dividends to principal unless the distribution is six percent or less of the number of shares of the corporation the trust holds, *N.J.S.A.* 3B:19A–13(a)—likewise is triggered only when the trust instrument is silent on the allocation. See *N.J.S.A.* 3B:19A–3.

Less clear, however, is what the testator meant by the term "stock dividend." Although Dawson's will states specifically that the trustees should allocate stock dividends to income, the will does not define the term "stock dividend." The estate of Anna Coffin Dawson argues that inasmuch as Dawson's primary intention was to benefit his wife, the Court should interpret the term "stock dividend" to favor her estate by allocating all the disputed distributions to income.

We do not agree that the will so readily demonstrates an intent to benefit only, or even primarily, the testator's wife. As the trial court observed, "The reality is that he evidenced [in the] dispositions * * * substantial concern for his collateral descendants as well as a very substantial concern for his wife. * * * The fact is

he cared about both sets." Moreover, noticeably absent in the will is a provision frequently used in other trust instruments allowing trustees to invade principal for the benefit of the life beneficiary (here, Anna Coffin Dawson) in specified circumstances.

Thus, because Dawson intended to benefit both his wife and his collateral descendants, we will not craft a definition of "stock dividend" that results in the dispositions going automatically to income, benefitting only Anna Coffin Dawson. As this Court has noted, an

> allocation * * * to *corpus* will inure to the benefit of both [the life beneficiary and the remaindermen]; the life *cestui* will immediately get the value of its use for life and the remainderman will receive the balance of its value, without subjecting the estate to the expense of attempting to ascertain by inexact means, the equities between the parties.
>
> [*In re Estate of Fera*, 26 *N.J.* 131, 144, 139 *A.*2d 23 (1958).]

Under the circumstances we turn to sources beyond the will for guidance in defining "stock dividend." *See, e.g., In re Estate of Munger*, 63 *N.J.* 514, 522–23, 309 *A.*2d 205 (1973) (determining that neither will nor extrinsic circumstances defined term "securities" and accordingly looking to other sources to define it); *Wilson v. Flowers*, 58 *N.J.* 250, 263–64, 277 *A.*2d 199 (1971) (looking to extrinsic sources to define term in will).

### III

We first review our basic understanding of equity accounts on a corporation's balance sheet as a prelude to our explanation of why the manipulation of those accounts has historically influenced our characterization of stock distributions. Stock distributions usually involve three accounts: (1) the capital-stock or stated-capital account, (2) the capital-surplus or additional-paid-in-capital account, and (3) the retained-earnings account. Concerning the first, capital stock or stated capital represents the total par value of all the shares of stock that a corporation has issued. 11 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5079 (Lenore M. Zajdel, ed., perm. ed. rev. vol. 1986). Par value is an arbitrary amount that a corporation sets as the value of

a share interest in the corporation. *Chadwick v. McClurg,* 103 *N.J.Eq.* 55, 59, 142 *A.* 173 (Ch.1928); 18 *C.J.S. Corporations* § 131 (1990). In respect of the second account, capital surplus or additional-paid-in capital represents the amount in excess of par value paid toward the purchase of newly-issued stock. 11 Fletcher, *supra,* § 5080. Thus, for example, if a corporation sells a $10 par value newly-issued share of stock for $100, $10 of the proceeds goes into the capital-stock account and $90 goes into the capital-surplus account. (We do not discuss no-par stock because none of the eight stock distributions disputed in this case involves no-par stock.) The third account, involving retained earnings, represents the accumulated profits from the corporation's operations, *i.e.,* the net sum of the corporation's yearly profits and losses.

According to Generally Accepted Accounting Principles (GAAP), the term "stock dividend" describes a corporation's issuance of additional shares of stock to existing shareholders based on their proportionate interests in the corporation. Martin A. Miller, *Comprehensive GAAP Guide* § 38.08 (1989). A corporation's purpose in issuing a stock dividend is generally to distribute earnings. *Ibid.* A stock dividend does not change a corporation's assets or its shareholders' proportionate interests therein. Financial Accounting Standards Board, *1989/90 Accounting Standards* § C20.103 (1989). A corporation records a stock dividend in its journals by transferring "an amount equal to the fair market value of the stock dividend * * * from retained earnings to capital stock and, if appropriate, to paid-in capital." Miller, *supra,* § 38.08. When a corporation effects a stock dividend, it normally issues only a proportionately small number of shares, *i.e.,* less than twenty to twenty-five percent of its outstanding shares. *Id.* at § 38.09.

A stock split, on the other hand, typically involves "a stock distribution [of] more than 20% to 25% of the outstanding shares * * *." *Ibid.; see Accounting Standards, supra,* § C20.108. A corporation will use a stock split to reduce the market price of its stock to make that stock more attractive to potential buyers.

Miller, *supra,* § 38.09. After a stock split, the total dollar amount of each existing stockholder's equity remains the same, but the par value per share changes in proportion to the change in the number of shares of stock outstanding. *Ibid.* For example, if a corporation exchanges four shares with a par value of $10 for each outstanding $40 par-value share (a four-to-one split), the existing shareholder then owns four $10 par-value shares instead of one $40 par-value share. Corporations do not make journal entries to record stock splits except to note in the capital-stock account the new par value and the number of new shares outstanding. *Id.* at § 38.10.

The question presented is how to determine whether a distribution is a stock dividend or a stock split when the distribution has characteristics of both types of transactions. In this case, all eight distributions had journal entries showing transfers from a surplus account to a capital account (indicating stock dividend), but all eight also involved distributions of a large number of shares that affected the market price (indicating stock split). See Appendix, *infra* at 22–25, 641 *A.*2d at 1036–37 (describing disputed stock distributions).

The traditional approach views the characteristic feature of a stock dividend as the capitalization of assets. That approach will find a stock dividend when a corporation transfers assets from surplus (retained earnings or capital surplus), from which a corporation may pay cash dividends, to a capital account, from which a corporation may not pay cash dividends. *See* 11 Fletcher, *supra,* § 5359 (stating, "A stock dividend is a dividend payable in reserved or additional stock of the corporation, instead of in cash or in property, the purpose of which is generally to capitalize a portion of the company's earnings in order to conserve working capital." (footnote omitted)); 18 *C.J.S. Corporations, supra,* § 294 (stating that "a stock dividend involves the permanent retention of earnings in the business through the capitalization of surplus; this retention of earnings is evidenced by the distribution

of shares which represent assets transferred to capital" (footnote omitted)).

Our cases have accepted the traditional approach to stock dividends. In *Arens, supra,* 41 *N.J.* 364, 197 *A.*2d 1, this Court had to determine whether to change the common law in respect of trustees' allocation of stock distributions. The common law had been the Pennsylvania rule (treating dividends as income if declared from earnings accrued during the existence of the trust but treating them as principal if declared from earnings accrued before the existence of the trust), and the question was whether to adopt in its place the Massachusetts rule (treating cash dividends as income and stock dividends as principal). *Id.* at 367–68, 197 *A.*2d 1. Although the Legislature had enacted *N.J.S.A.* 3A:14–4A(a) and –5A(a) in May 1952, adopting the Massachusetts rule, the issue in *Arens* was whether the Court should alter the common-law rule for pre–1952 trusts. Although not central to the Court's ultimate decision to change New Jersey's common-law allocation rule, the Court pointed out that a stock dividend involves

> a capitalization of earnings by a transfer on the corporate books, from the earned surplus account to a capital account, of an amount fixed by the corporation as the price paid * * * for the new stock issued to the shareholders. Actually this does not amount to a *distribution* of earnings, but rather the opposite—a decision to retain them permanently in the business * * *.
>
> [*Id.* at 375, 197 *A.*2d 1.]

In a later case, the Appellate Division relied on the traditional definition in *Arens* to describe a stock dividend. See *In re Estate of Conway,* 92 *N.J.Super.* 428, 224 *A.*2d 7 (1966), *modified on other grounds,* 50 *N.J.* 525, 236 *A.*2d 841 (1967). In *Conway,* a trustee of a testamentary trust requested instructions from the court on whether shares of stock distributed to a trust should be allocated to income or to principal. The Appellate Division concluded that the distribution in question "retained the essential characteristics of a stock dividend," *id.* at 446, 224 *A.*2d 7—that is, the issuing corporation had "transferred * * * undivided profits to

its permanent capital account, this being an amount equal to the par value of the shares distributed." *Id.* at 445, 224 *A.*2d 7.

New Jersey case law therefore appears to have adopted the traditional test for stock dividends, namely, whether a capitalization of earnings accompanied the distribution.

Courts from other jurisdictions as well have identified stock dividends by determining whether the issuing corporations transferred funds from a surplus account to stated capital. See, *e.g.*, *Keller Industries, Inc. v. Fineberg,* 203 *So.*2d 644, 646 (Fla.Dist. Ct.App.1967), *cert. denied,* 210 *So.*2d 868 (1968); *Anacomp, Inc. v. Wright,* 449 *N.E.*2d 610, 617 (Ind.Ct.App.1983); *In re Estate of Mellott,* 1 *Kan.App.*2d 709, 574 *P.*2d 960, 969 (1977); *Geier v. Mercantile–Safe Deposit and Trust Co.,* 273 *Md.* 102, 328 *A.*2d 311, 321 (1974); *In re Fosdick's Trust,* 4 *N.Y.*2d 646, 176 *N.Y.S.*2d 966, 152 *N.E.*2d 228, 232 (1958); *Millar v. Mountcastle,* 161 *Ohio St.* 409, 119 *N.E.*2d 626, 632 (1954); *In re Estate of Rees,* 210 *Or.* 429, 311 *P.*2d 438, 441 (1957); *In re Trust Estate of Pew,* 398 *Pa.* 523, 158 *A.*2d 552, 555 (1960).

Following the traditional *Arens* approach, the Appellate Division in this case concluded (as had the trial court in the first three intermediate accountings) that the disputed distributions were stock dividends when the issuing corporations capitalized some amount of earnings. The guardian *ad litem* and Manufacturers Hanover Trust Company argue, however, that the traditional approach produces absurd results, that it is outdated, and accordingly that the trial court for the fourth intermediate accounting correctly replaced it with a different rule. We agree.

First, we agree with the observation concerning the peculiar results produced by a strict application of the traditional approach. Distributions to the trust of General Electric Company (General Electric) stock provide an excellent illustration of the incongruity that results from classifying stock distributions based solely on whether the issuing corporation transferred assets to a capital account. The first General Electric stock distribution occurred in June 1983. Before the distribution, the trust owned 1,200 shares

of $2.50 par-value stock. The trust received an additional 1,200 shares of $1.25 par-value stock, and General Electric reduced the par value of the previously-held shares to $1.25 as well. Accordingly, the trust held 2,400 shares of $1.25 par-value stock in place of the 1,200 shares of $2.50 par-value stock it had owned previously. Before the distribution the market price of the shares was $105 per share, and after the distribution the market price was $53.25 per share. The cash dividend per share after the distribution changed from $0.85 per share to $0.475 per share, increasing slightly the total cash dividends paid. General Electric characterized the transaction as a two-for-one stock split, and no party to this action disagreed with that characterization.

The second General Electric distribution, disputed by the parties here, occurred in June 1987. See Appendix, *infra* at 24, 641 A.2d at 1037. Before the distribution the trust owned 2,400 shares of $1.25 par value stock. The trust received an additional 2,400 shares of $0.63 par-value stock, and General Electric reduced the par value of the previously-held shares to $0.63 as well. Accordingly, the trust held 4,800 shares of $0.63 par-value stock in place of the 2,400 shares of $1.25 par-value stock it had owned previously. Before the distribution, the market price of the shares was $100.50 per share, and after the distribution the market price was $51.875 per share. Thus, up to that point, the first and second General Electric transactions seem identical in form. The difference between the two transactions is that in the second distribution, General Electric transferred $0.005 per share (a total of $24.00) from surplus to its stated-capital account to avoid having shares with a par value of a fraction of a cent. General Electric characterized the second transaction as a two-for-one stock split, but the Appellate Division called it a stock dividend because the corporation had transferred a token amount from surplus to stated capital.

We perceive no practical difference, however, between the two distributions that would justify characterizing the first as a stock split and the second as a stock dividend. General Electric clearly

intended both transactions to reduce the price of its stock without affecting corporate assets. Both transactions did reduce the market price of the shares by about fifty percent. Moreover, we can hardly describe the transfer of a mere $24.00 to stated capital as an attempt by General Electric to capitalize earnings. The transfer of that small amount, which constituted nothing more than a ministerial act designed to simplify the corporation's calculation of par value, should not be the key determining factor in deciding the overall character of the stock distribution.

Moreover, the financial-accounting rationale for the traditional approach may have undergone erosion. Before 1988, New Jersey statutes required corporations to issue cash dividends out of surplus. See *N.J.S.A.* 14A:7–14(2) (stating that "[d]ividends may be declared or paid * * * out of surplus only * * *"). That is why the source of a distribution (and the corresponding journal entries) determined whether the distribution was a dividend. The Legislature abandoned that requirement in 1988, however, by enacting a new rule, permitting a corporation to pay cash dividends out of *any* account if (a) the corporation would not be unable to pay its debts as they became due or (b) the corporation's total assets would not be less than its total liabilities. *See* *N.J.S.A.* 14A:7–14.1 (repealing *N.J.S.A.* 14A:7–14(2)). Although that statute deals only with cash dividends, it nevertheless suggests that the nature of a stock distribution should no longer turn on the source of funds for that distribution.

We are convinced that the better approach is a functional one. As the General Electric stock-distribution example and the changing financial-accounting rules tell us, letting the result turn on whether a mere token transfer of assets to stated capital has occurred emphasizes technical bookkeeping form over the true effect of a transaction. We need a rule that more accurately reflects the issuing corporation's intention: whether to reduce the market price of its shares to attract more investors, or to reorganize its capital structure, or to distribute earnings.

At least one other court has experienced similar dissatisfaction with the traditional approach in its effort to classify a complicated stock distribution. In *Rogers Walla Walla, Inc. v. Ballard,* 16 *Wash.App.* 81, 553 *P.*2d 1372 (1976), the issuing corporation had distributed to defendants 2,400 shares of no-par-value stock with a stated capital of $6 per share in exchange for 100 shares of $100 par-value stock. For each new share the corporation issued to defendants, it transferred $1.83 from earned surplus to capital stock. The trial court determined that the transaction was a twenty-four-to-one stock split. Defendants argued, however, that the transaction was a stock dividend, "contend[ing that] the capitalization of earnings surplus * * * settles the issue of dividend versus split." *Id.,* 553 *P.*2d at 1376.

The *Ballard* court disagreed with the defendants, stating that "a capitalization of earnings incident to an increase in the number of outstanding shares is far from conclusive as to whether the transaction is properly designated a dividend or a split." *Ibid.* The court looked instead to several other factors to determine that the transaction was actually a split:

> (1) It is clear that [plaintiff's] board of directors *intended* the distribution be treated as a split; (2) the distribution resulted in a pronounced ratio of new shares to old; ordinarily 25 percent is viewed as the maximum share increase for a stock dividend, as distinguished from a split; (3) there was no recent history of [plaintiff's] stock dividends to minimize this percentage test; and (4) the per share unit value was markedly diluted, from $100 par value to $6 stated value, by the transaction.

> [*Ibid.* (footnotes omitted).]

The rule that we adopt today is similar to the trial court's bright-line rule that a stock dividend is a distribution of less than twenty-five percent of the sharehold. We modify that rule only to temper its arbitrariness, by treating the twenty-five percent as a rebuttable presumption. Although twenty-five percent is *usually* the maximum share increase for a stock dividend, see *Ballard, supra,* 553 *P.*2d at 1376 (stating that "ordinarily 25 percent is viewed as the maximum share increase for a stock dividend * * * "); *Accounting Standards, supra,* § C20.106 (same); Miller,

*supra*, § 38.09 (same); New York Stock Exchange, *Listed Company Manual* § 703.02 (1983) (same), a twenty-five-percent cut-off may not work well in every case. So complex are stock distributions that we cannot safely discern their character by falling back on generalizations. Accordingly, although twenty-five percent is the presumptive benchmark, courts may look behind a transaction to determine what the issuing corporation intended to accomplish through the transaction.

▇▇▇▇ We therefore adopt a rebuttable presumption that a distribution of less than twenty-five percent is a stock dividend and a distribution of twenty-five percent or more is a stock split. In looking behind the transaction, courts should inquire into all the facts and circumstances surrounding the distribution, including (1) the effect of the distribution on the market price of the stock and (2) the issuing corporation's description of the transaction. We caution that of course a corporation's mere use of the word "dividend" should not be controlling.

The foregoing presumptive rule provides at least two benefits: (1) it better reflects the true nature of stock distributions than does the traditional rule, and (2) it is easy to follow.

▇▇▇▇ Applying that rule to this case, we conclude that all eight distributions are stock splits; accordingly, we direct that the trustees allocate them to principal. See Appendix, *infra* at 22–25, 641 A.2d at 1036–37 (describing disputed stock transactions). All eight transactions involved distributions of more than twenty-five percent of the issuing corporations' respective shareholds (the distributions ranged from fifty percent to 200 percent). Moreover, accompanying all eight distributions was a significant decrease in the market price of the shares (the decreases in stock price ranged from approximately thirty-three percent to sixty-six percent). Further, in most cases the transfers from surplus accounts to capital accounts were quite small. Finally, in seven out of the eight disputed transactions, the issuing corporations themselves characterized the transactions as stock splits. In the remaining case, the issuing corporation put no label on the trans-

action. Thus, all eight transactions represent stock splits rather than efforts to capitalize assets or to distribute earnings.

## IV

■ Anna Coffin Dawson's estate argues that the doctrine of collateral estoppel precludes this Court from applying a new definition of stock dividend in the fourth intermediate accounting. The estate asserts that inasmuch as the Chancery Division in the first intermediate accounting decided what method to use to determine whether to characterize stock distributions as dividends or splits, this Court may not use a different method for the fourth intermediate accounting. We do not agree, however, that collateral estoppel precludes us from applying our newly-adopted rule to the accounting before us.

■ For the doctrine of collateral estoppel to apply to foreclose the relitigation of an issue, the party asserting the bar must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding, *see Pittman v. LaFontaine,* 756 *F.Supp.* 834, 841 (D.N.J.1991) (stating that for issue to be precluded subsequent action must involve substantially similar or identical issues); (2) the issue was actually litigated in the prior proceeding, *see ibid.* (stating that "the litigant against whom issue preclusion is invoked must have had a full and fair opportunity to litigate the issue in the previous tribunal"); (3) the court in the prior proceeding issued a final judgment on the merits, *see State v. Redinger,* 64 *N.J.* 41, 45, 312 *A.*2d 129 (1973) (stating that collateral estoppel applies when "issue of ultimate fact has [ ] been determined by a valid and final judgment * * *"); (4) the determination of the issue was essential to the prior judgment, *see Warren Township v. Suffness,* 225 *N.J.Super.* 399, 408, 542 *A.*2d 931 (App.Div.) (stating that "[c]ollateral estoppel applies * * * to those [matters and facts] necessary to support the judgment rendered in the prior action"), *certif. denied,* 113 *N.J.* 640, 552 *A.*2d 166 (1988); and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding. *See Wunschel v.*

*City of Jersey City,* 96 *N.J.* 651, 658, 477 *A.*2d 329 (1984) (stating, "Central to the application of the doctrine [of collateral estoppel] is that the party against whom the doctrine is to be invoked must have been party to or privy to the prior proceedings.").

Application of those requirements demonstrates that collateral estoppel does not bar our applying a new rule in these proceedings. First, the issues litigated in the fourth intermediate accounting are not identical to the issues litigated in the prior intermediate accountings. Although the prior accountings did deal with the characterization of various stock distributions as dividends or splits and with their resulting allocation to corpus or to income, the issuing corporations and their respective stock distributions were not the same in those accountings: whereas in the first intermediate accounting the trial court dealt with the allocation of stock distributions from American Electric and Ohio Edison, here in the fourth intermediate accounting we must determine how to characterize distributions from Bellsouth, Citicorp, Dart & Kraft, General Electric, Horizon Bancorp, and Pacific Telesis. Inasmuch as the corporations and their corresponding stock transactions are different, the issues to be litigated in the accountings are different as well.

Moreover, no sufficient identity of parties exists. The interests of the unborn beneficiaries, who were not represented in the prior accountings but who are represented now by the guardian *ad litem,* did not receive in those prior accountings sufficient protection to bind them in this action. The conflict between the interests of the beneficiaries is clear. Although the minor beneficiaries who were represented in the first three accountings, which were rendered while Anna Coffin Dawson was still alive, did hold remainder interests in the trust at those times, many of those beneficiaries had the potential to become income beneficiaries in the foreseeable future. In fact, many of those persons would likely never live to receive the remainder; they would have to survive for twenty-one years after the death of the last survivor of the persons named in the will, all of whom were still alive,

according to the guardian *ad litem*, at the time these accountings were filed. Accordingly, during the prior accountings, the interest of those beneficiaries did not lie completely with preserving the corpus. On the other hand, many of the minor and unborn beneficiaries now represented by the guardian *ad litem* would have been interested then, and are interested now, solely in preserving corpus because they will likely live to be the ultimate remaindermen. Therefore, because the beneficiaries represented in the prior accountings did not have same interests as the interest of the guardian *ad litem*'s wards, collateral estoppel does not apply. *See Stegmeier v. St. Elizabeth Hosp.*, 239 *N.J.Super.* 475, 487–88, 571 *A.*2d 1006 (App.Div.1990) ("That the parties may have similar interest in the outcome of the litigation * * * does not of itself establish privity of interest for purpose of issue preclusion."); *cf. Rutgers Casualty Ins. Co. v. Dickerson*, 215 *N.J.Super.* 116, 122, 521 *A.*2d 373 (App.Div.1987) (pointing out that fact that parties have similar interest in outcome of litigation does not in itself establish privity of interest for *res judicata* purposes).

Finally, the doctrine of virtual representation, codified at *Rule* 4:26–3, does not require us to reach a different result. That doctrine allows "a party to the action whose future interest is the same as others having a future interest * * * [to represent the interests of the others because] a necessary by-product of that party's own self-interested activity * * * will constitute adequate protection of the interest of the non-parties." Pressler, *Current N.J. Court Rules*, comment on *R.* 4:26–3 (1993). However, the doctrine does not apply if "it shall affirmatively appear in the action that there exists a conflict of interest between the persons so joined and the persons not joined." *R.* 4:26–3(a). We are satisfied that here the interests of the beneficiaries conflict.

Even if all the elements of collateral estoppel did clearly exist, however, we would not apply that doctrine in the circumstances before us. This case would fit into an exception to the doctrine's application:

> The ability of a court to readdress previously adjudicated issues may under appropriate circumstances be exercised despite the narrow confines of issue preclusion or *res judicata*. This is especially true where * * * the issue is purely one of law and a new determination is warranted to avoid inequitable administration of the law.
>
> [*Plainfield v. Public Serv. Elec. & Gas Co.*, 82 *N.J.* 245, 258–59, 412 *A.*2d 759 (1980) (citations omitted).]

*See also State, Dep't of Envtl. Protection & Energy v. Santomauro*, 261 *N.J.Super.* 339, 342, 618 *A.*2d 917 (App.Div.1993) ("[C]ollateral estoppel is an equitable doctrine and need not be applied 'if there are sufficient countervailing interests,' or if it would not be fair to do so.") (quoting *In re Coruzzi*, 95 *N.J.* 557, 568, 472 *A.*2d 546 *appeal dismissed sub nom. Coruzzi v. New Jersey*, 469 *U.S.* 802, 105 *S.Ct.* 56, 83 *L.Ed.*2d 8 (1984)).

The issue before us is purely one of law: the definition of a stock dividend. Moreover, we seek to avoid the inequitable results associated with application of the traditional approach. *See supra*, at 15–21 (discussing General Electric stock example). Accordingly, collateral estoppel does not bar our adoption of a twenty-five-percent rebuttable presumption to distinguish stock dividends from stock splits.

## V

The judgment of the Appellate Division is reversed, and the judgment of the Chancery Division requiring the trustees to allocate the eight disputed stock distributions to principal is reinstated.

*For reversal and reinstatement*—Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI, and STEIN—5.

*Opposed*—None.

## APPENDIX

### *Descriptions of the Stock Distributions*

The following descriptions of the eight disputed stock distributions are from the complaint filed by Manufacturers Hanover Trust Company in respect of the fourth and fifth intermediate accounts.

### (1) Bellsouth: May 31, 1984

The trust owned 300 shares of $1 par-value common stock. Bellsouth distributed to the trust an additional 600 shares of $1 par-value common stock, transferring funds from capital surplus to capital stock. The distribution did not reduce the par value of the previously-held shares but it did reduce the market price of the shares from $91 to $29.8125 per share (approximately sixty-six percent). Before the distribution the cash dividend on each of the shares was $1.95 and after the distribution it was $0.65. Accordingly, the total cash dividend the trust received was the same before and after the distribution (although the amount of the dividend per share was less after the distribution, the trust owned three times as many shares as before the distribution). Bellsouth characterized the distribution as a stock split.

### (2) Bellsouth: March 3, 1987

The trust owned 900 shares of $1 par-value common stock. Bellsouth distributed to the trust an additional 450 shares of $1 par-value common stock, transferring unissued shares out of capital surplus into stated capital. The distribution did not reduce the par value of the previously-held shares but it did reduce the market price of the shares from $60.50 to $40.50 per share (approximately thirty-three percent). The distribution increased slightly the total cash dividends paid to the trust. Bellsouth characterized that distribution as a stock split as well.

### (3) Citicorp: November 20, 1987

The trust owned 500 shares of $1 par-value common stock. Citicorp distributed to the trust an additional 500 shares of $1 par-value common stock, transferring unissued shares from surplus capital. The distribution did not reduce the par value of the previously-held shares but it did reduce the market price of the

shares from $41.375 to $20.5625 per share (approximately fifty percent). The total cash dividends paid on the stock remained the same after the distribution. Citicorp characterized the transaction as a two-for-one stock split.

### (4) Dart & Kraft (now Kraft General Foods, Inc.): June 24, 1985

The trust owned 500 shares of $2.50 par-value common stock. Dart & Kraft distributed to the trust an additional 1,000 shares of $1 par-value common stock, reducing the par value of the 500 previously-held shares from $2.50 to $1.00 per share. Dart & Kraft effected the distribution by transferring $0.50 for each already-issued share from its capital-surplus account to its common-stock account. The distribution reduced the market value of the shares from $103.75 to $34.6875 per share (approximately sixty-six percent). The total cash dividends paid on the stock remained the same. Dart & Kraft did not characterize the transaction.

### (5) General Electric Company: June 4, 1987

The trust owned 2,400 shares of $1.25 par value common stock. General Electric distributed to the trust an additional 2,400 shares of common stock with a par value of $0.63, reducing the par value of the previously-held shares to $0.63 as well. General Electric transferred $0.005 per share from surplus to its stated-capital account to avoid having shares with a par value of a fraction of a cent. The distribution reduced the market price of the shares from $100.50 to $51.875 per share (approximately fifty percent). General Electric characterized the transaction as a two-for-one split.

### (6) Horizon Bancorp: February 9, 1984

The trust owned 1,500 shares of $4.00 par value stock. Horizon Bancorp transferred to the trust an additional 750 shares of $4.00 par-value stock, charging $4.00 against retained earnings and crediting $4.00 to the common-stock capital account. The distribution did not reduce the par value of any of the previously-held stock but it did reduce the market price of the shares from $30.50

to $20.625 per share (approximately thirty-three percent). The distribution also increased the total cash dividends paid to the trust. Horizon Bancorp characterized the transaction as a three-for-two split.

### (7) Pacific Telesis Group: June 17, 1986

The trust owned 475 shares of $0.10 par value common stock. Pacific Telesis distributed to the trust an additional 475 shares of $0.10 par-value common stock, transferring for each additional share issued $0.10 from the Additional Paid–In Capital Account to the Common Stock Account. The distribution did not reduce the par value of the stock previously held but it did reduce the value of the shares from $101.25 to $50.375 per share (approximately fifty percent). The total cash dividends paid to the trust after the distribution remained the same. Pacific Telesis characterized the transaction as a two-for-one stock split.

### (8) Pacific Telesis Group: April 2, 1987

The trust owned 950 shares of $0.10 par-value common stock. Pacific Telesis distributed to the trust an additional 950 shares of $0.10 par-value common stock, transferring for each additional share issued $0.10 from the Additional Paid–In Capital Account to the Common Stock Account. The distribution did not reduce the par value of the previously-held shares but it did reduce the value of the shares from $55.375 to $27.375 per share (approximately fifty percent). The total cash dividends paid to the trust increased after the distribution. Pacific Telesis again characterized the transaction as a two-for-one stock split.